## ROOSEVELT CROSLAND, JR. vs. WILLIAM HORGAN.

Worcester. September 11, 1987. — December 15, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Eavesdropping. Statute,* Construction. *Words,* "Intercepting device," "Interception," "Ordinary course of business."

In an action brought against a State police detective under G. L. c. 272, § 99 Q, the eavesdropping statute, by an individual whose voice had been identified as that of a male caller who had made bomb threats to a hospital, but against whom charges were ultimately dismissed for lack of probable cause, evidence that an extension telephone at the hospital had been used by the hospital employee who had received the threats, at the direction of the defendant, who was investigating in conjunction with the hospital's own chief of security, to identify the voice of the maker of the telephone bomb threats warranted a finding that the telephone extension was being used "in the hospital's ordinary course of . . . business" so that the telephone was not an "intercepting device" under G. L. c. 272, § 99 B 3. [274-277]

CIVIL ACTION commenced in the Superior Court Department on March 12, 1981.

The case was tried before *Elbert Tuttle,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Jeffrey M. Feuer (Benjamin Hiller* with him) for the plaintiff.

*Elizabeth Bowen Donovan,* Assistant Attorney General, for the defendant.

LYNCH, J. This is an appeal from the denial of the plaintiff's motions for directed verdict and judgment notwithstanding the verdict in a civil action brought under G. L. c. 272, § 99 Q (1986 ed.).[1] We transferred the case to this court on our own motion. We affirm.

---

[1] The statute's civil remedy provision, G. L. c. 272, § 99 Q, states: "Any aggrieved person whose oral or wire communications were intercepted,

The undisputed relevant facts are as follows. On or about April 13, 1978, University of Massachusetts Medical Center in Worcester received a series of telephoned bomb threats. The defendant, a Massachusetts State police detective, was assigned to investigate. Among those with whom he spoke was the chief of security for the hospital. This initial investigation revealed that, with the exception of one call, all the April, 1978, threats were apparently made by the same male caller and were received by Kelly Sarabalis, a secretary in the medical records department. A subsequent bomb threat was traced to a specific telephone number in the hospital through a trap installed by New England Telephone Company.

The plaintiff was a temporary employee at the hospital. He became the focus of the investigation after the defendant learned that the plaintiff had been suspected during a prior period of temporary employment of making obscene telephone calls to personnel in the medical records department. The defendant had also learned that the plaintiff had been arrested and imprisoned in North Carolina.

Prior to trial, the parties stipulated to the following facts: "First that on April 20, 1978, the defendant, Lieutenant Hor-

disclosed or used except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by this section shall have a civil cause of action against any person who so intercepts, discloses or uses such communications or who so violates his personal property or privacy interest, and shall be entitled to recover from any such person — 1. actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher; 2. punitive damages; and 3. a reasonable attorney's fee and other litigation disbursements reasonably incurred. Good faith reliance on a warrant issued under this section shall constitute a complete defense to an action brought under this paragraph."

In pertinent part, § 99 C 1 defines the offenses as follows:

"Except as otherwise specifically provided in this section any person who — willfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception of any wire or oral communication shall be fined not more than ten thousand dollars, or imprisoned in the state prison for not more than five years, or imprisoned in a jail or house of correction for not more than two and one half years, or both so fined and given one such imprisonment."

gan, requested Miss Teresa Capurso to place a phone call to the plaintiff, Mr. Crosland, from the Medical Records Section of the University of Massachusetts Medical Center. Second, at that time the defendant, Lieutenant Horgan, requested Miss Kelly Sarabalis to pick up the extension telephone and listen to the voice. She did so at his request. Three, Mr. Crosland never gave his permission for anyone to listen to the conversation. Four, Lieutenant Horgan was at all times relevant a law enforcement officer. Five, Lieutenant Horgan had prior authorization from Miss Capurso to have Kelly Sarabalis listen on the extension phone. Six, at the time Miss Sarabalis listened to the phone call, she was employed as a secretary to Mr. Baker at the University of Massachusetts Medical Center."

Sarabalis identified the plaintiff's voice as that of the male caller who made the bomb threats. The plaintiff was arrested later that day, charged with violations of G. L. c. 269, § 14 (making false reports of bomb threats), and held in jail for two days. He incurred legal expenses and testified to emotional pain and suffering related to his incarceration and anxiety regarding the outcome of the case. These charges ultimately were dismissed for lack of probable cause.

At trial, the defendant introduced evidence seeking to establish that the eavesdropping at issue was done "in the course of an investigation of a designated offense," thereby removing the transaction from the statutory meaning of an "interception." G. L. c. 272, § 99 B 4. In addition, the defendant opposed the plaintiff's motion for directed verdict on the ground that the extension telephone used by Sarabalis to identify the plaintiff's voice was not an "intercepting device" within the meaning of G. L. c. 272, § 99 B 3, and that there was therefore no "interception" within the meaning of G. L. c. 272, § 99 B 4, because it was a "telephone or telegraph instrument, equipment, facility, or component thereof . . . furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff *and being used by the subscriber or user in the ordinary course of its business"* (emphasis supplied). G. L. c. 272, § 99 B 3.[2]

---

[2] The transcript of the oral argument on plaintiff's motion for directed verdict was not included by the parties in the record appendix. In view of

We conclude that the evidence in this case warranted a finding that the telephone extension was being used "in the ordinary course of . . . business" of the hospital so that the telephone was not an "intercepting device" under G. L. c. 272, § 99 B 3. It is therefore unnecessary for us to decide whether the defendant met his burden of proving he was engaged in the investigation of a designated offense under *Commonwealth v. Thorpe,* 384 Mass. 271 (1981), cert. denied, 457 U.S. 1147 (1982).

At the core of the plaintiff's argument on appeal is the contention that the § 99 B 3 exemption for a telephone extension used in the ordinary course of business is inapplicable because the defendant was not an employee of University of Massachusetts Medical Center, and because it is not part of the medical center's ordinary course of business to engage in investigations of alleged criminal activity. The plaintiff also argues that there was no dispute of fact and no question for the jury to decide whether the use of the extension telephone was in the ordinary course of the hospital's business because of the stipulated facts noted earlier. This second argument not only presupposes a particular resolution of the legal issue posed by this case, namely, whether, as matter of law, it was open to the jury to decide that the defendant's conduct was part of the ordinary course of business of the hospital, but also ignores the judge's charge. The jury were instructed *twice* on the § 99 B 3 exclusion,[3] and the plaintiff did not object. He, therefore, cannot now argue that there was no factual issue by virtue of the stipulations.

In construing this statute we have examined the legislative history of the relevant portion of § 99 B 3 and conclude that it provides us with little clear guidance. However, the statute

the existence of a dispute between the parties as to which issues fairly have been preserved for appeal, we have obtained the transcript. See *Commonwealth v. Cinelli,* 389 Mass. 197, 199 n.3 (1983). We reject defendant's contention that the plaintiff has waived legal arguments regarding the scope of § 99 B 3. Nor do we share the plaintiff's view of the factual issues actually tried. See discussion *infra.*

[3] We have obtained a complete transcript of the jury charge. See note 2, *supra.*

tracks almost verbatim the corresponding language of a Federal statute, 18 U.S.C. §§ 2510-2520 (1982 & Supp. III 1985), with the notable difference that the Federal statute contains an additional exclusion from the definition of intercepting device for a telephone being used "by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii) (1982).[4]

"When the Legislature, in enacting a statute, adopts the language of a Federal statute, we will ordinarily construe the Massachusetts statute in accordance with the construction given the cognate Federal statute by the Federal courts." *Vasys* v. *Metropolitan Dist. Comm'n,* 387 Mass. 51, 54 (1982). Federal court decisions dealing with the so-called telephone extension used in the ordinary course of business exemption reveal an evolving approach to disputes regarding the ambit of what constitutes ordinary course of business which "suggests that the extension phone exemption is not to be applied or rejected in a wholesale fashion, but rather the circumstances of the eavesdropping and the content of the overheard conversations must be examined to determine whether the eavesdropping constitutes a use in the ordinary course of business." *Abel* v. *Bonfanti,* 625 F. Supp. 263, 270 (S.D.N.Y. 1985). But see *United States* v. *Harpel,* 493 F.2d 346, 351 (10th Cir. 1974) (holding as a matter of law that a telephone extension used without authorization or consent to record surreptitiously a private conversation is not used in the ordinary course of business). In cases involving the more usual problem of workplace eavesdropping on personal conversations, the issue has been characterized as whether there is a legitimate business purpose justifying intrusion into the caller's expectation of privacy. However, in light of the statutory purpose of protection from invasions of privacy, neither the concept of legitimate business purpose nor "ordinary course of business" can "be expanded to mean anything that interests a company." *Watkins* v. *L.M. Berry & Co.,* 704 F.2d 577, 582 (11th Cir. 1983).

---

[4] Some States have retained the ordinary course of duties exemption for law enforcement officers. See, e.g., *State* v. *McDermott,* 167 N.J. Super. 271, 276-277 (1979).

Here, we are dealing with a hospital which has as its central mission the care and treatment of patients. As has been said with regard to a different set of legal issues, "in the context of health-care facilities, the importance of the employer's interest in protecting patients from disturbance cannot be gainsaid." *Beth Israel Hosp.* v. *NLRB,* 437 U.S. 483, 505 (1978). The disruption and anxiety likely to be created by bomb scares, as well as the potential necessity of precautionary evacuation, pose a threat to the already precarious health of hospital patients and the ability of hospital staff to provide services. Accordingly, the maintenance of security and prevention of the sort of panic situation which may result from threats of incendiary explosions, whether real or false, may be viewed as an essential incident to the ability to provide medical services. The fact that, in this case, the conversation was monitored at the suggestion of a police officer does not prevent the jury from finding that it occurred in the course of the hospital's business, where the call to a hospital employee was from one hospital telephone to another, was monitored on hospital premises by the hospital employee who had received the threats which led to the presence of the police officer who was investigating in conjunction with the hospital's own chief of security. Furthermore, the eavesdropping was limited to voice identification which is clearly a prerequisite to halting anonymous telephone threats. While it is not the primary business of a hospital to investigate bomb threats, the jury would have been warranted in concluding that the use of the telephone was reasonably related to a legitimate business purpose and was, therefore, in the ordinary course of business of the hospital. We think this view to be consistent with *Campiti* v. *Walonis,* 453 F. Supp. 819, 822 (D. Mass. 1978), aff'd, 611 F.2d 387 (1st Cir. 1979), where the court relied upon a finding that the monitoring at issue was not reasonably related to the maintenance of internal security, an essential incident to the business of a prison.

In sum, we hold that, on these facts, it was open to the jury to decide whether the use of an extension telephone, at the direction of the defendant, to identify the maker of telephone bomb threats was in the hospital's ordinary course of business

such that the telephone did not constitute an intercepting device within the meaning of G. L. c. 272, § 99 B 3. The judgment for the defendant is therefore affirmed.

*So ordered.*