**Sibbie DEAL; Calvin Lucas, Appellees,**

v.

**Newell SPEARS; Juanita Spears, doing business as White Oak Package Store, Appellants.**

**Sibbie DEAL; Calvin Lucas, Appellants,**

v.

**Newell SPEARS; Juanita Spears, doing business as White Oak Package Store, Appellees.**

**Nos. 92–1143, 92–1238.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 17, 1992.

Decided Nov. 30, 1992.

Allen P. Roberts, Camden, Ark., argued, Janet L. Pulliam, Little Rock, Ark., on the brief, for appellant.

Don G. Gillaspie, El Dorado, Ark., argued, for appellee.

Before BOWMAN, Circuit Judge, HEANEY, and ROSS, Senior Circuit Judges.

BOWMAN, Circuit Judge.

This civil action is based on Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1988 & Supp. II 1990). Plaintiffs Sibbie Deal and Calvin Lucas seek damages against Deal's former employers, defendants Newell and Juanita Spears, doing business as the White Oak Package Store, for the intentional interception and disclosure of plaintiffs' telephone conversations. After a bench trial, the District Court[1] awarded statutory damages to Deal and Lucas in the amount of $40,000 and granted their request for attorney fees in accordance with Title III's fee-shifting provision. *Deal v. Spears*, 780 F.Supp. 618 (W.D.Ark. 1991). Newell and Juanita Spears appeal. Deal and Lucas cross-appeal the court's refusal to award punitive damages. We affirm.

The facts are set out in some detail in the District Court's published opinion, *id.* at 619–21, so we will simply highlight them here.

Newell and Juanita Spears have owned and operated the White Oak Package Store near Camden, Arkansas, for about twenty years. The Spearses live in a mobile home adjacent to the store. The telephone in the store has an extension in the home, and is the only phone line into either location. The same phone line thus is used for both the residential and the business phones.

Sibbie Deal was an employee at the store from December 1988 until she was fired in August 1990. The store was burglarized in April 1990 and approximately $16,000 was stolen. The Spearses believed that it was an inside job and suspected that Deal was involved. Hoping to catch the suspect in an unguarded admission, Newell Spears purchased and installed a recording device on the extension phone in the mobile home. When turned on, the machine would automatically record all conversations made or received on either phone, with no indication to the parties using the phone that their conversation was being recorded. Before purchasing the recorder, Newell Spears told a sheriff's department investigator that he was considering this surreptitious monitoring and the investigator told Spears that he did not "see anything wrong with that." *Id.* at 619.

Calls were taped from June 27, 1990, through August 13, 1990. During that period, Sibbie Deal, who was married to Mike Deal at the time, was having an extramarital affair with Calvin Lucas, then married to Pam Lucas.[2] Deal and Lucas spoke on the telephone at the store frequently and for long periods of time while Deal was at work. (Lucas was on 100% disability so he was at home all day.) Based on the trial testimony, the District Court concluded that much of the conversation between the two was "sexually provocative." *Id.* at 620. Deal also made or received numerous other personal telephone calls during her workday. Even before Newell Spears purchased the recorder, Deal was asked by her employers to cut down on her use of the phone for personal calls, and the Spearses told her they might resort to monitoring

---

1. The Honorable Oren Harris, Senior United States District Judge for the Western District of Arkansas.

2. The affair between Sibbie Deal and Calvin Lucas apparently followed a partner-swapping arrangement to which all four had consented. Both couples have since divorced and Sibbie Deal has married Calvin Lucas. Pam Lucas was Pam Whelan at the time of trial.

calls or installing a pay phone in order to curtail the abuse.

Newell Spears listened to virtually all twenty-two hours of the tapes he recorded, regardless of the nature of the calls or the content of the conversations, and Juanita Spears listened to some of them. Although there was nothing in the record to indicate that they learned anything about the burglary, they did learn, among other things, that Deal sold Lucas a keg of beer at cost, in violation of store policy. On August 13, 1990, when Deal came in to work the evening shift, Newell Spears played a few seconds of the incriminating tape for Deal and then fired her. Deal and Lucas filed this action on August 29, 1990, and the tapes and recorder were seized by a United States deputy marshal pursuant to court order on September 3, 1990.

Mike Deal[3] testified that Juanita Spears told him about the tapes, and that she divulged the general nature of the tapes to him. Pam Lucas testified that Juanita Spears intimated the contents of the tapes to her but only after Pam asked about them, and she also testified that Juanita told her to tell Sibbie to drop a workers compensation claim she had made against the store or "things could get ugly." Transcript at 67. Pam Lucas also testified that Juanita Spears "never told me what was on the tapes." Transcript at 68.[4] Juanita testified that she discussed the tapes and the nature of them, but only in general terms.

The Spearses challenge the court's finding of liability. They admit the taping but contend that the facts here bring their actions under two statutory exceptions to civil liability. Further, Juanita Spears alleges that she did not disclose information learned from the tapes, thus the statutory damages assessed against her on that ground were improper. For their part Deal and Lucas challenge the court's failure to award them punitive damages as permitted by statute.

■■■ The elements of a violation of the wire and electronic communications interception provisions (Title III) of the Omnibus Crime Control and Safe Streets Act of 1968 are set forth in the section that makes such interceptions a criminal offense. 18 U.S.C. § 2511 (1988). Under the relevant provisions of the statute, criminal liability attaches and a federal civil cause of action arises when a person intentionally intercepts a wire or electronic communication or intentionally discloses the contents of the interception. Id. §§ 2511(1)(a), (c), 2520(a) (1988). The successful civil plaintiff may recover actual damages plus any profits made by the violator. If statutory damages will result in a larger recovery than actual damages, the violator must pay the plaintiff "the greater of $100 a day for each day of violation or $10,000."[5] Id. § 2520(c)(2)(B) (1988). Further, punitive damages, attorney fees, and "other litigation costs reasonably incurred" are allowed. Id. § 2520(b)(2), (3) (1988).

The Spearses first claim they are exempt from civil liability because Sibbie Deal consented to the interception of calls that she made from and received at the store. Under the statute, it is not unlawful "to intercept a wire, oral, or electronic communication ... where one of the parties to the communication has given prior consent to such interception," 18 U.S.C. § 2511(2)(d), and thus no civil liability is incurred. The Spearses contend that Deal's consent may be implied because Newell Spears had mentioned that he might be forced to monitor

---

**3.** Mike Deal's testimony was by deposition because, although he was subpoenaed for trial, he apparently was not served as there was no return on the subpoena at the time of trial.

**4.** The recollections of both Mike Deal and Pam Lucas were refreshed by written statements they recorded weeks after the conversations with Juanita Spears took place, and after this lawsuit was filed. Mike Deal testified that Sibbie assisted him with his statement, that she in fact wrote it and he signed it. Pam Lucas said repeatedly

during her testimony that she was assisted by Calvin Lucas in preparing her statement.

**5.** The District Court arrived at a total of $40,000 in statutory damages by awarding $10,000 each to Deal and Lucas, and against Newell Spears, for interception, and $10,000 each to Deal and Lucas, and against Juanita Spears, for disclosure. *Deal v. Spears*, 780 F.Supp. 618, 624 (W.D.Ark 1991). None of the parties appeals the quantum of statutory damages awarded.

calls or restrict telephone privileges if abuse of the store's telephone for personal calls continued. They further argue that the extension in their home gave actual notice to Deal that her calls could be overheard, and that this notice resulted in her implied consent to interception. We find these arguments unpersuasive.

■ There is no evidence of express consent here. Although constructive consent is inadequate, actual consent may be implied from the circumstances. *See Griggs–Ryan v. Smith*, 904 F.2d 112, 116 (1st Cir.1990). Nevertheless, "[c]onsent under title III is not to be cavalierly implied.... [K]nowledge of the *capability* of monitoring alone cannot be considered implied consent." *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 581 (11th Cir.1983) (citations omitted).

■ We do not believe that Deal's consent may be implied from the circumstances relied upon in the Spearses' arguments. The Spearses did not inform Deal that they were monitoring the phone, but only told her they might do so in order to cut down on personal calls. Moreover, it seems clear that the couple anticipated Deal would not suspect that they were intercepting her calls, since they hoped to catch her making an admission about the burglary, an outcome they would not expect if she knew her calls were being recorded. As for listening in via the extension, Deal testified that she knew when someone picked up the extension in the residence while she was on the store phone, as there was an audible "click" on the line.[6]

Given these circumstances, we hold as a matter of law that the Spearses have failed to show Deal's consent to the interception and recording of her conversations.

■ The Spearses also argue that they are immune from liability under what has become known as an exemption for business use of a telephone extension. The exception is actually a restrictive definition.

Under Title III, a party becomes criminally and civilly liable when he or she "intercepts" wire communications. " '[I]ntercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any **electronic, mechanical, or other device**[.]" 18 U.S.C. § 2510(4) (emphasis added). Such a device is "any device or apparatus which can be used to intercept a wire, oral, or electronic communication" except when that device is a

> telephone ... instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business[.]

*Id.* § 2510(5)(a)(i) (1988).

Thus there are two essential elements that must be proved before this becomes a viable defense: the intercepting equipment must be furnished to the user by the phone company or connected to the phone line, and it must be used in the ordinary course of business. The Spearses argue that the extension in their residence, to which the recorder was connected, meets the equipment requirement, and the listening-in was done in the ordinary course of business. We disagree.

■ First, we are not as easily convinced as is at least one of our sister circuits that an extension telephone is exempt equipment under section 2510(5)(a)(i) when a recording device is attached to the extension to record calls for later listening. *See Epps v. Saint Mary's Hosp. of Athens, Inc.*, 802 F.2d 412, 415 (11th Cir.1986) (holding that the interception device was not the equipment used to record the conversation but the dispatch console to which the recorder was attached). The calls would not

---

6. There was at least one occasion, however, when Deal was on the phone and did not hear Newell Spears pick up the extension. At the time, Deal was shouting to a beer delivery person as he was exiting the store, apparently about the keg of beer she was hoping to acquire, at cost, for Calvin Lucas.

have been heard or otherwise acquired—that is, intercepted—at all but for the recording device, as the Spearses did not spend twenty-two hours listening in on the residential extension. When turned on, the recorder was activated automatically by the lifting of the handset of either phone, even though it was connected only to the extension phone. Further, Deal ordinarily would know (by the "click" on the line) when the residential extension was picked up while she was using the store phone; thus her calls likely would not have been intercepted if the recorder had not been in place.

It seems far more plausible to us that the recording device, and not the extension phone, is the instrument used to intercept the call. We do not believe the recording device falls within the statutory exemption. The recorder was purchased by Newell Spears at Radio Shack, not provided by the telephone company. Further, it was connected to the extension phone, which was itself the instrument connected to the phone line. There was no evidence that the recorder could have operated independently of the telephone.

We hold that the recording device, and not the extension phone, intercepted the calls. But even if the extension phone intercepted the calls, we do not agree that the interception was in the ordinary course of business.

We do not quarrel with the contention that the Spearses had a legitimate business reason for listening in: they suspected Deal's involvement in a burglary of the store and hoped she would incriminate herself in a conversation on the phone. Moreover, Deal was abusing her privileges by using the phone for numerous personal calls even, by her own admission, when there were customers in the store. The Spearses might legitimately have monitored Deal's calls to the extent necessary to determine that the calls were personal and made or received in violation of store policy.

But the Spearses recorded twenty-two hours of calls, and Newell Spears listened to all of them without regard to their rela-

tion to his business interests. Granted, Deal might have mentioned the burglary at any time during the conversations, but we do not believe that the Spearses' suspicions justified the extent of the intrusion. *See Watkins,* 704 F.2d at 583 ("We hold that a personal call may not be intercepted in the ordinary course of business under the exemption in section 2510(5)(a)(i), except to the extent necessary to guard against unauthorized use of the telephone or to determine whether a call is personal or not."); *Briggs v. American Air Filter Co.,* 630 F.2d 414, 420 n. 9 (5th Cir.1980) ("A general practice of surreptitious monitoring would be more intrusive on employees' privacy than monitoring limited to specific occasions."). We conclude that the scope of the interception in this case takes us well beyond the boundaries of the ordinary course of business.

For the reasons we have indicated, the Spearses cannot avail themselves of the telephone extension/business use exemption of Title III.

Juanita Spears also contends that she did not communicate the information on the tapes, and thus she is not liable for disclosure under the statute. Liability attaches when a party "intentionally discloses ... to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained" through an interception illegal under Title III. 18 U.S.C. § 2511(1)(c). The statutory definition of "contents," a term of art under Title III, brings Juanita's alleged disclosures within the purview of the statute; she need not play the tapes or repeat conversations to be liable. " '[C]ontents', when used with respect to any wire, oral, or electronic communication, includes any information concerning the **substance, purport, or meaning** of that communication[.]" *Id.* § 2510(8) (1988) (emphasis added).

Based on the testimony of plaintiffs and their witnesses, which the trial court credited, Juanita Spears disclosed enough of the "contents" of the taped conversations between Deal and Lucas to incur liability. We have reviewed the record in this case,

including the trial transcript and the depositions offered as evidence, and we cannot say that the District Court's finding that Juanita Spears disclosed the "contents" of the tapes is clearly erroneous.

■ Finally, Deal and Lucas cross-appeal the District Court's failure to award punitive damages. *See id.* § 2520(b)(2). Punitive damages are unwarranted under Title III unless Deal and Lucas can prove "a wanton, reckless or malicious violation." *Bess v. Bess,* 929 F.2d 1332, 1335 (8th Cir. 1991). It is difficult to conceive of a case less appropriate for punitive damages than this one.

■ The Spearses had lost $16,000 by theft in what must have been a serious blow to their business, and installed the recorder in hopes that they would be able to recover their loss, or at least catch the thief. They suspected an inside job and naturally they were anxious to find out whether the burglar was one of their employees. Further, despite warnings about abuse of the phone, the Spearses were paying a salary to an employee for the hours she spent on personal calls, including (as it turned out) her conversations with her lover. She sometimes carried on these conversations in the presence of the store's customers and apparently not infrequently used salacious language. The Spearses were not taping to get "dirt" on Lucas and Deal, but believed their business interests justified the recording. Moreover, before installing the recorder, Newell Spears inquired of a law enforcement officer and was told that the officer saw nothing wrong with Spears tapping his own phone. While the Spearses' reliance on the officer's statement does not absolve them of liability, it clearly demonstrates that the taping was neither wanton nor reckless. As for the disclosures, Sibbie Deal was the only person for whom any of the tapes were played, and even then Newell Spears played the tape for only a few seconds, just enough to let Deal know why she was being fired. There was no evidence that taped conversations were repeated verbatim, or that anything but vague substance was revealed. Other than Sibbie Deal, those who testified as to direct knowledge of the disclosures apparently believed Juanita Spears had their best interests at heart and that the disclosures were in the manner of a warning to them and not malicious.

We agree with the District Court that defendants' conduct does not warrant the imposition of punitive damages.

The judgment of the District Court is affirmed in all respects.