Cratsley, J.
Plaintiffs, Kenneth O’Sullivan and others similarly situated (“the class”), brought this action for injunctive and declaratory relief against NYNEX Corporation (“NYNEX”), alleging violations of G.L.c. 272, §99, G.L.c. 214, §1B and G.L.c. 93A. This matter comes before the Court on consideration of NYNEX’s motion to dismiss the complaint under Mass.R.Civ.P. 12(b)(6), or, in the alternative, for summary judgment under Mass.R.Civ.P. 56. For the following reasons, NYNEX’s motion to dismiss is converted into a motion for summary judgment and is ALLOWED.
BACKGROUND
The facts as set out in the plaintiffs’ second amended verified complaint, viewed in the light most favorable to the plaintiffs, are as follows. Between September 1 and November 30, 1995, employees of the NYNEX Direct Marketing Center made telemarketing calls to local NYNEX customers in order to offer and sell telephone services such as additional lines, “Call Return” and “Call Waiting.” Approximately 4%, or 90,000 of these calls were randomly selected and recorded by a computer software/hardware system known as “Autoquality!”. While NYNEX staff knew of the company practice of monitoring and recording telemarketing calls, NYNEX customers were not informed before, during or after their call that the conversation had been recorded.
Once the calls had been recorded by the Autoquality! system, the recordings were reviewed by managers from the NYNEX Quality Control Department. Access to the recordings made by Autoquality! was restricted: a special code was needed to access the recordings, and such codes were only given to NYNEX supervisors whose responsibilities included quality control. Prior to the installation of the Autoquality! system, NYNEX did not record any telemarketing calls, but, instead, NYNEX supervisors randomly monitored calls or portions of calls from the Direct Marketing Center at the time they were being made.
Although the Autoquality! system recorded the entire conversation between NYNEX telemarketing employees and customers, it did not make a special note of the customer’s name or telephone number. The Autoquality! system retained the recording of each call for fourteen days. After fourteen days, Autoquality! automatically deleted the call unless specifically instructed by a supervisor to retain it for a longer period of time. If so instructed, Autoquality! retained each recording for sixty days for further review.
NYNEX ceased using the Autoquality! system on November 30, 1995. The plaintiffs filed this action on December 1, 1995. The plaintiffs are NYNEX customers who received telemarketing calls during the period in which the Autoquality! system was operational. The plaintiffs do not know whether their conversations with NYNEX telemarketers were recorded; NYNEX concedes that no method exists to recover the names of all those who were recorded by the Autoquality! system.
DISCUSSION
A. Standing of the plaintiffs to raise their claims
G.L.c. 272, §99[2] creates a cause of action for “any aggrieved person whose oral or wire communications were intercepted ... or whose personal or property *648 interests or privacy were violated by means of an interception . . .” G.L.c. 272, §99(Q). In its brief, NYNEX states that the plaintiffs’ claims should be dismissed as speculative. NYNEX contends that the plaintiffs fail to allege that their conversations were in fact listened to and/or recorded and, thus, the plaintiffs do not have standing. Contrary to NYNEX’s argument, the plaintiffs maintain that dismissal of their complaint for legal insufficiency at this stage of proceedings would be premature. The plaintiffs base this rationale on the nature of secret monitoring and/or recording and the difficulties of positively identifying the victims of an alleged wiretap. Furthermore, the plaintiffs contend that during discovery NYNEX failed to produce any lists of the monitored callers thereby creating this ambiguity involving the plaintiffs’ identity.
When determining whether the plaintiffs have standing to bring an action against NYNEX for allegedly violating the wiretapping statute “the context, subject matter and area of concern of the statute” should be reviewed. Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 68 (1992) (citing Beard Motors, Inc. v. Toyota Motors Distribs., Inc., 395 Mass. 428, 431-32 (1985)). The Massachusetts Wiretap Statute is to protect “the privacy of all citizens of the commonwealth.” It is apparent that this area of concern is due to the nature of wiretapping. When dealing with wiretapping there is such a high level of secrecy that, “it would be unusual if anyone other than [NYNEX], and its employees involved in the wiretapping, had knowledge of the specific incidents ofwire tapping." Awbrey v. Great Atlantic & Pacific Tea Co., Inc., 505 F.Supp. 604, 607 (N.D.Georgia 1980).
In fact, “(t]he usual way a wiretap victim could acquire personal, first-hand knowledge of a particular act of wiretapping would either be (1) by listening at some later time to a recorded telephone conversation or (2) by somehow seeing the tapping done . . .” Id. Although NYNEX has produced discovery including deposition testimony, documents related to the Auto-Quality! system, and other documentation, no documentation regarding the identities of anyone who was either recorded or monitored was provided.[3]
In Awbrey v. Great Atlantic & Pacific Tea Co., Inc., supra at 606, the defendant claimed that the plaintiff, after having approximately twenty-nine months of discovery, failed to produce sufficient evidence of a wire communication that was intercepted. Relying on Broadway v. City of Montgomery, 530 F.2d 657, 659 (5th Cir. 1976), the “(d)efendant A&P base[d] its argument that plaintiffs case is insufficiently specific ...” Id. at 606.
The federal trial judge in Awbrey, however, distinguished the Broadway case holding that “(itj was based on the absence of any proof that defendant’s . . . were involved in the wiretapping.” Id. (citing Broadway v. City of Montgomery, supra) (emphasis added). In the present case, NYNEX has stated that it has recorded and/or monitored calls. The Awbrey court concluded that “defendant’s argument that plaintiffs lack of specificity . . . warrants the granting of defendant’s motion for summary judgment flies in the face of both the statute and the nature of the tort." Id.
Additionally, the Eleventh Circuit has recognized the burden that is placed on plaintiffs in producing specific evidence on a wiretap violation because ”[d]irect evidence may not be available based on the stealthiness of the invasion ...” Scutieri v. Paige, 808 F.2d 785, 790 (11th Cir. 1987). The Eleventh Circuit’s decision is demonstrative that “(t]he success of a wiretap ultimately depends upon secrecy and concealment." Id.
In light of this case law on standing that has developed under both federal and state wiretapping statutes, the plaintiffs “can raise a question of fact regarding [NYNEX’s] actual interception of [the plaintiffs] conversations without proving the contents of specific conversations allegedly intercepted.” Walker v. Darby, 911 F.2d 1573, 1578 (11th Cir. 1990). Considering the nature of wiretapping and the purpose of the wiretapping statute, this Court finds that the plaintiffs have standing to challenge the acts of NYNEX in accordance with the language of the wiretapping statute.
B. The plaintiffs’ claims under G.L.c. 272, §99[4]
The plaintiffs assert that NYNEX has violated their rights under the wiretapping statute, G.L.c. 272, §99. This statute is “the primary law protecting the security and privacy of business and personal communications in the United States today.” 1986 U.S. Code Cong, and Admin. News (Leg. Hist.) 3555. As this case involves a detailed analysis of this statute, the Court begins with a recitation of the pertinent provisions of G.L.c. 272, §99:
B. Definitions . . .
3. The term “intercepting device” means any device or apparatus which is capable of transmitting, receiving, amplifying or recording a wire or oral communication other than a hearing aid or similar device which is being used to correct subnormal hearing to normal and other than any telephone or telegraph instrument, equipment, facility or component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business.
4. The term “interception” means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting *649 device by any person other than the person given authority by all parties to such communication . . .
C. Offenses.
1. Interception, oral communications prohibited.
Except as otherwise specifically provided in this section any person who . . . wilfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception . . . shall be fined ... or imprisoned . . .
D. Exemptions
1. Permitted interception of wire or oral communications
It shall not be a violation of this section—
a. for an operator of a switchboard, or an officer, employee or agent of any communications carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose or use that communication in the normal course of his employment while engaged in any activity which is necessary incident to the rendition of service or to the protection of the rights or property of the carrier of such communication . . . provided, that said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks . . .
Q. Civil remedy
Any aggrieved person whose oral and wire communications were intercepted ... except as permitted or authorized by this section . . . shall have a civil cause of action against any person who so intercepts, discloses or uses such communication
The defendant’s motion involves two of the statutory exceptions to liability; first, NYNEX argues that its actions do not qualify as an “interception” under the definition set out in G.L.c. 272, §99(B)(3), and, second, that even if they do, they are a “permitted interception of wire and oral communications” under G.L.c. 272, §99(D)(l)(a).
The Massachusetts wiretapping statute “in major portion matches section for section the provisions of Title III” [the federal statute governing “wire interception and interception of oral communications”]. 18 U.S.C. §2510-§2520;[5] Commonwealth v. Vitello, 367 Mass. 224, 251 (1975). The federal statute was originally enacted in response to Berger v. New York, 388 U.S. 41 (1967), where the Supreme Court held unconstitutional a New York statute authorizing widespread electronic eavesdropping, yet allowed that wiretapping might be constitutionally permissible if accompanied by strict judicial oversight. Commonwealth v. Vitello, supra at 241-43. The Supreme Judicial Court considered the Massachusetts statute a proper exercise of state power;[6] the statute is therefore considered to be as or more protective of individual Fourth Amendment rights than the federal statute. Id. at 247. Additionally, the Supreme Judicial Court has noted that “when the Legislature, in enacting a statute, adopts the language of a Federal statute, we will ordinarily construe the Massachusetts statute in accordance with the construction given the cognate Federal statute by the Federal courts.” Crosland v. Horgan, 401 Mass. 271 (1987), quoting Vasys v. Metropolitan Dist. Comm’n, 387 Mass. 51, 54 (1982). Accordingly, this Court will examine the opinions of the federal courts in order to interpret the sections of the statute necessary to the resolution of this motion, mindful of the fact that the Massachusetts statute can only be as or more protective of individual privacy rights than the federal statute.
The Court first considers whether the Autoquality! system qualifies as an “intercepting device:”
3. The term “intercepting device” means any device or apparatus which is capable of transmitting, receiving, amplifying or recording a wire or oral communication. G.L.c. 272, §99(B)(3).
Although a line of federal cases distinguish machines that divert and broadcast conversations, such as extension telephones, from machines that record the diverted and intercepted communication, Epps v. St. Mary’s Hospital of Athens, Inc., 802 F.2d 412 (11th Cir. 1986), and Royal Health Care Servs. v. Jefferson-Pilot Life, 924 F.2d 215 (11th Cir. 1991), this Court notes that this distinction is the result of the drafting of a section of the federal statute that was not enacted in Massachusetts. Unlike the federal statute, the Massachusetts statute includes “recording” among the class of activities included in the term “intercepting.” G.L.c. 272, §99; 18 U.S.C. §2511. Additionally, Autoquality! is different from the machines discussed in these cases: unlike the double-reel recorder in Epps, which recorded but did not intercept the calls, Autoquality! selected the calls that would be intercepted, performed the actual interception, and then recorded the result. Epps v. St. Mary’s Hospital of Athens, Inc., supra at 218. As a result, this Court concludes that under the initial statutory definition, Autoquality is an “intercepting device.” Deal v. Spears, 980 F.2d 1153 (8th Cir. 1992).[7]
The Court now moves to one of the statutory exceptions to the definition of “intercepting device,” the “telephone equipment” exception:[8]
The term “intercepting device” means any device . . . other than any telephone or telegraph instrument, equipment, facilify or component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business. G.L.c. 272, §99(B)(3)
*650 NYNEX contends, first, that the Autoquality! system is a “telephone or telegraph instrument, equipment, facility or component thereof’ and, second, that Au-toquality! was “being used ... in the ordinary course of its business.”
The “telephone equipment” exception applies to several categories of machines: “telephone instruments”; “telephone equipment”; “telephone facilities” and “components thereof.” Mindful that, whenever possible, the Court should give meaning and effect to each word in a statute so that no word is rendered superfluous, the Court interprets each of these categories as separate and at least partially distinct. Int’l Org. of Masters, etc. v. Woods Hole, Martha’s Vineyard and Nantucket Steamship Authority, 392 Mass. 811, 813 (1984). Therefore, in order to give the term “telephone . . . equipment” meaning, the Court concludes that the items included within this category must include some that are not defined by “telephone instruments,” “telephone facilities” or “components thereof.”
The term “equipment” is defined as “furnishings, or outfit for the required purposes.” Black’s Law Dictionary 482 (5th Ed. 1979). Although Autoquality! is not a telephone facility or system (it does not make or receive telephone calls), it is a machine designed for and used by a communications company to randomly monitor and record telephone conversations; it was designed to operate with telephone lines and has no function outside of its application to telephone lines. The system is described in its official “Product Description" as “a call center management tool that automates performance monitoring.” A determination that Autoquality! was not telephone equipment would rely upon a reductive reading of the term, a reading that only included actual “telephone instruments” (telephones and components thereof) within “telephone equipment.” While it is not true that any sort of device or machine attached to a telephone would qualify as “telephone equipment,” a machine built only to work within a telephone system and to perform a function related to the effectiveness of the telephone company’s operations must be “telephone equipment” or the term is reduced to mere surplusage.
This analysis is supported by the definitions of “telephone instrument, equipment, facility or component thereof’ reached by courts that have considered the question. Although in Commonwealth v. Todisco, 363 Mass. 445, 452 (1972), the Supreme Judicial Court determined that the phrase did not include eavesdropping devices “external and extraneous” to regular telephone devices, a recent line of federal court cases is more instructive. In Pascale v. Carolina Freight Carriers Corp., 898 F.Supp. 276 (D.N.J. 1995), Sanders v. Robert Bosch Corp., 38 F.3d 736 (4th Cir. 1994), Williams v. Poulos, 11 F.3d 271 (1st.Cir. 1993), and Deal v. Spears, supra, the federal courts have ruled that machines that do not improve or further a communications system, such as recording devices, are not “telephone equipment” unless these machines are devices manufactured and installed by the telephone company. Pascale v. Carolina Freight Carriers Corp., supra at 281, Sanders v. Robert Bosch Corp., supra at 740 n.9. This Court concludes the converse; that devices manufactured and installed by the telephone company in order to improve company performance are “telephone equipment.”
Concluding therefore that Autoquality! qualifies as “telephone . . . equipment,” the Court now considers whether Autoquality! was used by a communications common carrier in the ordinary course of its business. The majority of cases interpreting the term “ordinary course of business” have construed the term in the context of workplace eavesdropping by employers on employee telephone calls. See, e.g.: Crosland v. Horgan, supra; United States v. Harpel, 493 F.2d 346, 351 (10th Cir. 1974). These cases have established that listening in on work-related conversations is legal, but that eavesdropping on private calls is illegal unless there “is a legitimate business purpose” for the employer listening in on the employee’s conversation. Crosland v. Horgan, supra at 275.
For instance, in Crosland the Supreme Judicial Court applied the “extension telephone” exception where a police officer at a hospital called a man suspected of telephoning in bomb threats, and placed the hospital employee who had received the original threatening calls on an extension line so that she could identify the culprit by his voice. Id. The Supreme Judicial Court determined that this interception was made in the ordinary course of business because the prevention of future bomb threats was part of the hospital’s central mission, “the care and treatment of patients.” Id. at 276.
In Deal v. Spears, supra, the Eighth Circuit discussed employer eavesdropping and concluded that an employer would be justified in listening in on employee calls if, for instance, the employee was suspected of committing a crime, or the employee was thought to be making excessive amounts of personal calls. In the latter case, however, the employer would need to hang up the extension telephone as soon as he or she established that the call made by the employee was personal rather than business. Deal v. Spears, supra at 1157, citing Watkins v. L.M. Berry & Co., 704 F.2d 577 (11th Cir. 1983); see also James v. Newspaper Agency Corp., 591 F.2d 579 (10th Cir. 1979).
The calls made by the NYNEX telemarketers were made for the purposes of offering and selling additional telephone services to NYNEX customers. Neither party disputes NYNEX’s legitimate business interest, as manager and monitor of quality control, in listening to the way its employees handled their telemarketing duties. NYNEX had an additional reason for carefully monitoring the performance of its *651 telemarketers; the need to see that telemarketing offers did not stray outside the guidelines imposed by the telecommunications statutes. G.L.c. 166, §1, et seq. This legitimate goal would not have been attained had NYNEX refrained from monitoring the conversations of the customers who answered the telephones. Restricting its supervision to the one-sided conversations of its managers would unduly restrict NYNEX’s ability to supervise the performance of its employees. Effective supervision requires that NYNEX listen in to the customers’ questions and responses so that the ability of the employees to respond could be measured.
The practice of recording the customers’ calls was also within the bounds of accepted business practice. Briggs v. American Air Filter Co., supra at 418 (in determining if eavesdropping qualifies for the “ordinary course of business” exception, the court considers the standard practices used by businesses today). Although the practice of recording the customers’ responses is more difficult to justify than simple monitoring, especially where the recording is done absent the consent or warning of both the parties,[9] the practice could provide serious, tangible benefits to the quality standards of NYNEX sales personnel. It would have been hard for NYNEX to judge the performance and responsiveness of its sales personnel without hearing both sides of the conversation. Proper training and management also require that NYNEX supervisors and telemarketers be able to retrieve their conversations or listen to them repeatedly.
Additionally, the Court notes that access to the recordings was strictly limited to personnel involved in telemarketing management. A further safeguard to protect consumer privacy existed since if these key personnel did not access and repeatedly save the recordings, the recordings were automatically erased. Since safeguards were in place to protect customer privacy, and since the use of the monitored and recorded conversations was limited to that necessary for NYNEX training and supervision needs, the Court concludes that NYNEX’s practices of monitoring and recording customer conversations were performed within the “ordinary course of business.”
However, even if, arguendo, the practice of recording falls outside the “telephone equipment” exception, NYNEX’s activity is also insulated from legal liability under the “common carrier” exception:
It shall not be a violation of this section—
a. for an operator of a switchboard, or an officer, employee or agent of any communications carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose or use that communication in the normal course of his employment while engaged in any activity which is necessary incident to the rendition of service or to the protection of the rights or property of the carrier of such communication . . . provided, that said communication-common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks . . .
G.L.c. 272, §99(D)(1)
NYNEX asserts that its activity, if conceded for the application of this section to be an “interception,” is a form of permissible quality control necessarily “incident to the rendition of service or to the protection of the rights or property of the carrier of such communication.”
Although the courts considering this section have interpreted this exception strictly, Williams v. Poulos, supra at 280, these courts have refrained from limiting its application to only emergency situations. Simmons v. Southwestern Bell Tel. Co., 452 F.Supp. 392, 395 (1978). The plain language of the statutory exception makes it applicable to “random monitoring” and “service observing” that is performed as part of a “mechanical or service quality control check.” In the contemporary business world, where the mission of a communications company such as NYNEX includes both the goal of providing basic telephone service (i.e., clear connections and available lines) and the goal of providing additional customized services to customers, part of NYNEX’s essential business operations involves informing its customer base of new telecommunications services that it believes may be of use to them. Quality control, in the contemporary world, includes the random monitoring necessary to insure that telephone lines are working correctly and the random monitoring and limited recording necessary to insure customers are provided with accurate information and courteous service.
In interpreting the wiretapping statute, the Court considers both the literal meaning of the words within the statute and the purpose and history of the statute itself. Massachusetts Hosp. Ass’n, Inc. v. Department of Medical Sec., 412 Mass. 340 (1992). G.L.c. 272, §99 commences with a long preamble setting out the legislature’s purposes in enacting the statute.[10] While the preamble focusses on the prohibition of the secret use of modern electronic surveillance devices by private individuals, the preamble does not mention the policies governing either the “telephone equipment” or “common carrier” exceptions. Without further guidance from the legislature, the Court is unwilling to interpret this statute to exclude standard quality control and performance monitoring from the category of NYNEX’s legitimate business activities. Compare Simmons v. Southwestern Bell Tel. Co., supra at 397 (defendant telephone company could have legitimate business interest in quality control).
As a contemporary business in a competitive service economy, NYNEX has an strong interest in and need for efficient, comprehensive quality control practices. Where these activities contravene individual privacy rights, the Court is bound to set out limitations on NYNEX’s appropriate sphere of business activity. *652 Here, however, the intrusion on individual rights is very limited. Private individuals who talk on the telephone with NYNEX representatives are aware that the entire content of their conversation is being communicated to NYNEX employees. They are free to halt the telephone call at its inception, as most do, or at anytime thereafter. Those who continue into and participate actively in these conversations must expect NYNEX to use the information obtained for their commercial purposes.
Any additional intrusion into their privacy that may ensue, from other NYNEX employees listening in to the conversation or from the recording of the conversation by a machine designed to automatically erase it and limit access to it to authorized personnel, is minimal. Since private individuals’ expectations of privacy are considered relevant to the scope of the wiretapping statute, Briggs v. American Air Filter Co., supra at 418, the Court can consider them in the context of determining whether “the privacy of telephone conversations has been invaded in a manner offensive to the words and intent of the [wiretapping] Act.” Campiti v. Walonis, supra at 392. Here, the difference between one NYNEX employee listening and several NYNEX employees listening is sufficiently slight for the Court to conclude that the words and intent of the wiretapping statute were not intended to prohibit the use of the Autoquality! system. This Court concludes that upon consideration of several of the relevant statutory exceptions the Autoquality! system does not violate the wiretapping statute.
ORDER
For the foregoing reasons, defendant NYNEX’s motion for summary judgment is ALLOWED.

While G.L.c. 272, §99 is entitled “Interception of wire and oral communications,” the Court, for reasons of simplicity, will refer to it as the “wiretapping statute.”

Approximately 90,000 calls were recorded by Autoquality! between September 1995 through August 1995.

In addition to their claims under the wiretapping statute, the plaintiffs allege violations of G.L.c. 93A and G.L.c. 214. However, at oral argument, the plaintiffs conceded that they had no claim for relief under the privacy statute, G.L.c. 214, unless they could prove that NYNEX had violated their rights under the wiretapping statute. Since the plaintiffs offered no oral argument to support their G.L.c. 93A claims, the Court concludes that they have similarly conceded that relief under G.L.c. 93A will not be forthcoming absent a proven violation of G.L.c. 272, §99. Therefore, the Court concentrates its attention on the plaintiffs central claim under the wiretapping statute.

 18 U.S.C. §2510 (Definitions) states in pertinent part:
(4) “intercept” means the aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device;
(5) “electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral or electronic communication other than—
(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business ... or (ii) being used by a provider of wire or electronic communication service in the ordinary course of its business . . .
18U.S.C. §2511 (Interception and disclosure of wire, oral or electronic communications prohibited) states in pertinent part:
(1) Except as otherwise specifically provided in this chapter any person who—
(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept and endeavor to intercept, any wire, oral or electronic communication; . . .
(2) (a) (i) It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose or use that communication in the normal course of his employment while engaged in any activity which is necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks. . .
A civil remedy for violation of this chapter is granted by 18 U.S.C. §2520(a).

 18 U.S.C.A. §2516(2) enables states to promulgate legislation authorizing wiretapping in limited situations.

Additionally, as is discussed infra, several of the federal courts have explicitly rejected the reasoning employed by the Eleventh Circuit in Epps. Epps v. St. Mary’s Hospital of Athens, Inc., supra.

The parties incorrectly refer to the applicable exception as the “extension telephone” exception. This term refers specifically to the exception set out in G.L.c. 272, §99(B)(3)(a), which was designed to insulate parents from liability when they listen in on their childrens’ telephone calls. Briggs v. American Air Filter Co., 630 F.2d 414, 418 (5th Cir. 1980). However, the exception applicable here is actually that set out in G.L.c. 272, §99(B)(3)(b) [telephone or telegraph instrument, equipment, facility or component thereof. .. being used by a commercial common carrier in the ordinary course of its business). This exception applies only to communications common carriers and is not relevant to the extension telephone scenario. The Court will refer to the G.L.c. 272, §99(B)(3)(b) exception as the “telephone equipment exception.”

Both parties admit that the NYNEX telemarketing employees here were aware that their calls could be recorded, but that the possibility of recording was not communicated to the customers called.

The preamble states in full:
The general court finds that organized crime exists within the commonwealth and that the increasing activities of organized crime constitute a grave danger to the public welfare and safety. Organized crime, as it exists in the *653 commonwealth today, consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services. In supplying these goods and services organized crime commits unlawful acts and employs brutal and violent tactics. Organized crime is infiltrating legitimate business activities and depriving honest businessmen of the right to make a living.
The general court further finds that because organized crime carries on its activities through layers of insulation and behind a wall of secrecy, government has been unsuccessful in curtailing and eliminating it. Normal investigative procedures are not effective in the investigation of illegal acts committed by organized crime. Therefore, law enforcement officials must be permitted to use modern methods of electronic surveillance, under strict judicial supervision, when investigating these organized crime activities.
The general court further finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices poses grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited. The use of such devices by law enforcement officials must be conducted under strict judicial supervision and should be limited to the investigation of organized crime.