USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT No. 96-1831 WILLIAM MORRILL GILDAY, JR., Plaintiff, Appellant, v. LARRY DUBOIS, ET AL., Defendants, Appellees.  APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Douglas P. Woodlock, U.S. District Judge]  Before Cyr, Circuit Judge, Stearns, U.S. District Judge, and Gertner, U.S. District Judge.  Mark M. Owen, with whom Edward S. Rooney, Jr., Andrea C. Dow and Lyne, Woodworth & Evarts LLP were on brief for appellant. Philip W. Silva, Department of Correction, with whom Nancy Ankers White, Special Assistant Attorney General, was on brief for appellees Dubois and Matesanz. Thomas R. Teehan for appellee New England Telephone and Telegraph Company. Susan E. Stenger, with whom Lawrence G. Green and Perkins, Smith & Cohen, LLP were on brief for appellee AT&T Corp.  August 29, 1997   Of the District of Massachusetts, sitting by designation. Of the District of Massachusetts, sitting by designation. CYR, Circuit  Judge. Plaintiff William Morrill Gilday, Jr. challenges a summary judgment ruling dismissing his civil rights claims and related claims for civil contempt against appellees Larry Dubois and James Matesanz, of the Massachusetts Department of Correction ("DOC"), and appellees American Telephone and Telegraph Corporation ("AT&T") and New England Telephone and Telegraph Company ("NET"). As Gilday failed to generate a trialworthy issue with respect to any claim, we affirm the district court judgment. I BACKGROUND After killing a Boston police officer during a 1970 bank robbery in Brighton, Massachusetts, Gilday was convicted of first degree murder and armed robbery, for which he is now serving concurrent life sentences at the Bay State Correctional Center in Norfolk, Massachusetts. In 1974, Gilday commenced a civil rights action in federal district court against various FBI and DOC offi- cials,  see  Gilday v.  Webster, No. 74-4169-C, alleging interference with attorney-client communications in violation of the Sixth and Fourteenth Amendments, and violations of the federal and state wiretap statutes, 18 U.S.C. SS 2510  et  seq., and Mass. Gen. L. ch.  The relevant facts are related in the light most favorable to Gilday, against whom summary judgment entered.  Hegarty v.  Somerset County, 53 F.3d 1367, 1370, n.1 (1st Cir.), cert. denied, 116 S. Ct. 675 (1995).  2 272, SS 99  et  seq. Gilday alleged that federal and state officials were opening his prison mail and intercepting his telephone communications in a coordinated effort to gather information regarding others involved in the Brighton bank robbery. Approximately ten years later, Gilday and four DOC officials entered into a stipulation ("settlement stipulation") which led to the following permanent injunction against the DOC and the defendant DOC officials on September 12, 1984 ("the Gilday injunction"): PERMANENT INJUNCTION  Having reviewed and approved the Settle- ment Stipulation dated September 10, 1984, and after hearing, it is hereby ORDERED, DECREED AND ADJUDGED as follows: 1. All officers, agents, ser- vants, employees and attorneys of the Department of Correction are enjoined permanently, under both 18 U.S.C. S 2510 et seq. and M.G.L. c. 272, S 99 et seq., from intercepting, en- deavoring to intercept, or pro- curing any other person to in- tercept or endeavor to inter- cept, any wire communication by or to plaintiff William Gilday without a specific court order or legislative authorization to do so, except as specifically permitted by these statutes, taken together, as they have been amended or may be amended  Around the same time, Gilday brought a  pro se action against four supervisory DOC officials alleging due process violations, denial of access to the courts, and theft of personal belongings. See Gilday v. Boone, 657 F.2d 1 (1st Cir. 1981).  Gilday proceeded with the action against the nonsettling DOC officials.  3 and  as  they  have  been  construed or  may  be  construed  in  reported decisions that are binding in this Court or in the state courts of Massachusetts. 2. [mail restrictions] 3. This  Permanent  Injunction, entered pursuant to the settle- ment stipulation dated Septem- ber 10, 1984, shall operate prospectively only; it shall not prejudice the rights of nonsettling defendants or, of its own force, affect the rights of inmates other than William Gilday. (Emphasis added.) Over the next ten years, however, developments in electronic technology, as well as inmate ingenuity, prompted increased prison-telephone abuses, such as acquiring merchandise by fraud, promoting drug violations, soliciting murder, harassing crime victims, witnesses, and public officials, facilitating escape plots, violating court restraining orders, and threatening domestic violence. The DOC responded in 1993 by inviting telephone-system vendors to furnish, install, and maintain an advanced prison telephone system designed to deter inmate abuses by monitoring, recording, and "detailing" their calls.  Ultimately, NET contracted to produce, install, and  For example, one DOC inmate alone managed to mischarge 271 so- called "third-party" calls to a single business firm in one month. See infra note 19. Call "detailing" involves recording such billing-related matters as the number called and the duration of the call. 4 maintain an inmate telephone system for all DOC facilities, which became known as the Massachusetts Inmate Telephone System ("MITS"), to supply both local and long distance service and remit to the DOC forty percent of the gross revenues from inmate calls. NET in turn subcontracted with AT&T to furnish long distance MITS service. A third company, Telematic Corporation, contracted with AT&T and NET to provide the electronic equipment and software needed to provision the system. On April 8, 1994, the DOC promulgated new inmate telephone regulations, see 103 C.M.R. SS 482.00 et seq. ("MITS Regulations"), "establish[ing] Department procedures regarding access to, use of and the monitoring and/or recording of inmate telephones." Id. S 482.01. Under the MITS Regulations, a personal identification number ("PIN") is randomly assigned to each inmate. The inmate must dial the assigned PIN immediately before dialing the telephone number, whereupon an automatic operator completes the connection. No more than fifteen designated parties are accessible with any PIN: ten friends and family members and five attorneys. See id. S 482.07(3)(c); Bender Aff. q 8. The right to call designated attorneys may not be suspended or curtailed except during an institutional emergency, see id. SS 482.08-482.09, whereas the right to call other designated parties is subject to disciplinary restriction, see id. SS 482.07(3)(h), 482.09. In addition, all inmates are allowed to call three prison legal- service organizations.  Stickers on all MITS telephones alert inmates to the 5 monitoring/recording regime. All inmate calls, except pre- authorized attorney calls and legal-service organization calls, are automatically recorded. Certain "detailing" information is recorded on all calls either attempted or completed. Finally, all except attorney and legal-service organization calls may be subjected to concurrent monitoring ( i.e., listened in on) by autho- rized DOC personnel, either at random or for investigative purposes. See id. S 482.07(3)(d).  In order to obtain an individual PIN, the inmate must complete and sign a "Number Request Form," designating the attorney and nonattorney telephone numbers which may be called. The form advises inmates that their "acceptance and use of a PIN and use of inmate telephones shall be deemed as consent to the conditions and restrictions placed upon inmate telephone calls, including call monitoring, recording, and call detail." All inmate calls must be placed "collect." Id. S 482.07(3)(a). Each call begins with a recorded message audible by both parties that the call has been placed "collect" by a DOC inmate and is subject to recordation and "detailing." See  id. S 482.07(3)(g); Kennedy Aff. q 10. Both parties hear the entire message, but there can be no communication until the collect call has been accepted by the person called.  See 103 C.M.R. S 482.07(3)(f); Bender Aff. q 11.  Gilday declined to submit a PIN request form, on the ground that the MITS contravenes the federal and state wiretap 6 statutes and therefore violates the Gilday injunction. At about the same time, Gilday mailed AT&T and NET copies of the Gilday injunction entered September 12, 1984,  see  supra pp. 3-4, advising that their provision of MITS services would violate the injunction. Shortly thereafter Gilday petitioned the federal district court for a contempt citation against AT&T, NET, and various DOC officials, claiming that the defendants were "endeavoring to intercept" his telephone communications. Although neither AT&T nor NET was privy to the Gilday injunction, Gilday asserted that both received actual notice by mail, supra pp. 6-7, and therefore knowingly aided and abetted the alleged violations by the DOC defendants. Finally, Gilday alleged, the defendants were depriving him of his "federal right to be free of any interception of his wire communications," as well as his Sixth Amendment right to counsel and his Fourteenth Amendment right of access to the courts, by restricting consultation with counsel regarding six pending judicial proceedings.  The district court entered summary judgment for the defendants, on the ground that the Gilday injunction bans neither monitoring nor recording, but only "interceptions." It noted that no secretive, nonconsensual monitoring or recording hence no  Consequently, for the most part Gilday has been without telephone access since the MITS went into operation. Under a stipulation among the parties, however, he has been allowed limited telephone use in order to communicate with counsel regarding his unrelated appeal in Gilday v. Callahan, 866 F.Supp. 611 (D. Mass. 1994),  aff'd, 59 F.3d 257 (1st Cir. 1995),  cert.  denied, 116 S. Ct. 1269 (1996). 7 "interception"  had occurred under either wiretap statute, since all recording and monitoring is well advertised as required by the MITS Regulations. See supra p. 6. The district court reasoned that inmates render the MITS monitoring/recording regime consensual by executing the request form and utilizing the MITS. And since it found the term "interception" ambiguous at best, the district court determined to resolve any interpretive doubts favorably to the defendants. Finally, it dismissed the Gilday claims relating to call "detailing," on the ground that  Langton v.  Hogan, 71 F.3d 930 (1st Cir. 1995), had already endorsed the MITS practice in this regard. Accordingly, it concluded that the attendant recording and monitoring did not constitute an "interception" under either the federal or state wiretap statute, thus did not contravene the Gilday injunction. Thereafter, the district court dismissed the section 1983 claims as well, on the ground that Gilday retained all mail privileges, access to a prison law library, the right to meet with counsel and, under the MITS regulations, the right to conduct unmonitored telephone communications with five attorneys and three legal-service organizations.   The district court likewise determined that the defendant DOC officials came within the "law enforcement" exceptions to the respective wiretap statutes. See 18 U.S.C. S 2510(5)(a)(ii) (excluding interceptions by an "investigative or law enforcement officer in the ordinary course of his duties"); Mass. Gen. L. ch. 272, S 99(D)(1)(c) (exempting federal law enforcement officials); see also, e.g., United  States v. Sababu, 891 F.2d 1308, 1328-29 (7th Cir. 1989) (concluding that a prison monitoring regime, conducted as part of an "institutionalized, ongoing policy[,]" does not constitute "interception"). 8 II DISCUSSION A. Standard of Review A summary judgment ruling is reviewed  de  novo and must be affirmed if the record, viewed in the light most favorable to the nonmoving party, "reveals no trialworthy issue of material fact and the moving party is entitled to judgment as a matter of law." Velez-Gomez v. SMA  Life  Assur.  Co., 8 F.3d 873, 874-75 (1st Cir. 1993). Moreover, we may affirm "on any independently sufficient ground." Polyplastics,  Inc. v. Transconex,  Inc., 827 F.2d 859, 860-61 (1st Cir. 1987).  B. The Contempt Claims  Gilday mounts several challenges to the district court rulings on the contempt claims. We address these arguments in turn, mindful that it was for Gilday to establish by "'clear and convincing evidence[,]'" Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir. 1991) (quoting Langton v. Johnston, 928 F.2d 1206, 1220 (1st Cir. 1991)), that the particular defendant violated an unambiguous consent decree "that left no reasonable doubt as to what behavior was to be expected,"  id. at 17. See  also  Porrata v. Gonzalez-Rivera, 958 F.2d 6, 8 (1st Cir. 1992) (stating that complainant must clearly establish that "a lucid and unambiguous consent order has been violated"); NBA Properties, Inc. v. Gold, 895 F.2d 30, 32 (1st Cir. 1990) (similar). Moreover, "'the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden.'" Kemp, 947 F.2d at 17 9 (quoting Drywall Tapers & Painters of Greater N.Y., Local 1974 v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n , 889 F.2d 389, 395 (2d Cir. 1989) (citation omitted));  see  also  Reed v. Cleveland Bd. of Educ. , 607 F.2d 749, 752 (6th Cir. 1979) (stating that judicial order must "clearly tell a reasonable person what he is required to do or abstain from doing"). From these requirements flows the important corollary that courts are to construe ambigu- ities and omissions in consent decrees as "'redound[ing] to the benefit of the person charged with contempt.'"  NBA Properties , 895 F.2d at 32 (quoting Ford v. Kammerer, 450 F.2d 279, 280 (3d Cir. 1971) (per curiam)); see also Kemp, 947 F.2d at 16 (same). 1. Issue Preclusion  As a threshold matter, Gilday insists that the DOC defendants are collaterally estopped from contending that the MITS does not violate the Gilday injunction, because this issue was resolved in Langton v. Hogan, No. 79-2167-Z, 1995 WL 96948 (D. Mass. Feb. 21, 1995), which culminated in a permanent injunction ("the Langton injunction") almost identical to the Gilday injunc- tion. Collateral estoppel, or issue preclusion, bars relitigation of any issue " actually decided in previous litigation 'between the parties, whether on the same or a different claim.'" Grella v.  Salem Five Cent Sav. Bank , 42 F.3d 26, 30 (1st Cir. 1994) (quoting  Dennis v.  Rhode Island Hosp. Trust , 744 F.2d 893, 899 (1st Cir. 1984) (emphasis in original) (quoting  Restatement (Second) of Judgments, S 27 (1982)). Although "[a]n issue may be 'actually' 10 decided even if it is not explicitly decided, for it may have constituted, logically or practically, a necessary component of the decision reached in the prior litigation,"  Grella, 42 F.3d at 30-31 (emphasis in original), the narrow, fact-based district court decision in  Langton had simply declined to  modify the injunction in that case, to permit monitoring and recording,  because  there  was  no evidence of inmate-telephone abuse by Langton or his fellow plaintiff. Thus, as the district court ruling on the petition for modification in Langton neither addressed nor implicated the question whether the MITS violates either the state or federal wiretap statute, see Langton, No. 79-2167-Z, 1995 WL 96948, it neither "actually" nor "necessarily" determined that the MITS regime violated the Langton injunction, let alone the Gilday injunction. See  Grella, 42 F.3d at 30 (stating that "the determi- nation of the issue must have been essential to the judgment"); see also NLRB v. Donna-Lee  Sportswear  Co.,  Inc., 836 F.2d 31, 34 (1st Cir. 1987) (same). 2. Claim Preclusion Gilday next contends that the 1984 consent decree precludes the DOC defendants from claiming that the MITS does not violate the Gilday injunction, because our decision in Langton v. Hogan, 71 F.3d 930, 933-35 (1st Cir. 1995), involving a similar  Furthermore, a determination that the MITS violated the Langton injunction with its materially different language and discrete purpose, see infra, pp. 12-25 could not constitute a determination that the  Gilday injunction, with its less restrictive language and scope, see infra p. 25, had been violated. 11 injunction, held that the DOC was precluded from contesting the meaning of the same state and federal wiretap statutes there involved without first obtaining a court order modifying the injunction. Once again we are unable to agree, as the Langton panel decision is inapposite for several reasons.  First, although the parties to a consent decree are bound by traditional preclusion principles and may not litigate claims necessarily resolved by the decree, see id. at 933-34, the Gilday injunction unlike the Langton injunction expressly provided that reported decisions authoritatively construing the relevant state and federal wiretap statutes (hereinafter: "authoritative decisions") were to control their future construction for all purposes material to the Gilday injunction. See supra pp. 3-4 ("All [DOC agents] are enjoined permanently . . . from . . . endeavoring to intercept . . . any wire communication by or to [Gilday] . . . except as specifically permitted by these statutes . . .  as  they have been construed or  may  be  construed  in [authori- tative decisions]."). (Emphasis added.) Thus, the construction suggested by Gilday would ignore language expressly limiting the scope of the  Gilday injunction. See  Mackin v.  City of Boston , 969 F.2d 1273, 1277 (1st Cir. 1992) (declining to construe consent decree so as to "overlook[] the language of the decree itself"). See  also  United States v.  ITT Continental Baking Co. , 420 U.S. 223, 236-37 (1975) (construing consent decrees as contracts); System- ized  of  New  England,  Inc. v. SCM,  Inc., 732 F.2d 1030, 1034 (1st Cir. 1984) (noting that courts are to adopt constructions that 12 "give meaning and effect to every part of a contract and reject those which reduce words to mere surplusage"). Accordingly, the Gilday injunction did not preclude reliance on intervening authori- tative decisions construing the state and federal wiretap statutes. Instead, "construed as it is written," United  States v. Armour  & Co., 402 U.S. 673, 682 (1971), the Gilday injunction, unlike the Langton injunction, plainly envisioned their consideration. Second, although the Langton panel majority concluded that the DOC had relinquished any right to litigate the meaning of these wiretap statutes as against the  Langton inmates,  see  Langton, 71 F.3d at 933-34, it did so because it believed those inmates otherwise would have  gained  nothing  beyond a mere promise by the DOC to obey the law:  The usually understood meaning of a Settlement Stipulation is that each party is agreeing to give up something to yield on one or more reasonably plausible contentions of law, or fact, or mixed-law-fact issues. "[T]he agree- ment reached normally embodies a compromise; in exchange for the saving of cost and elimi- nation of risk, the parties each give up something they might have won had they pro- ceeded with the litigation." When making an agreement for a consent decree, the parties to a case are agreeing not to press any of their disputes to decision in court. The parties forego "their right to litigate issues in- volved in the case and thus save themselves the time, expense and inevitable risk of liti- gation."  The Langton injunction prohibited the DOC defendants from intercepting inmate wire communications except as specifically permitted by the federal and state wiretap statutes "as they have been  construed in reported decisions that  are binding on this court or in the state courts of Massachusetts." Langton, 71 F.3d at 931 (emphasis added). 13  Id. (quoting Armour  &  Co., 402 U.S. at 681) (internal citation omitted). On the other hand, in the present case the consent decree secured Gilday a substantial independent benefit unavailable to the Langton plaintiffs. As the district court recognized, Gilday had alleged in his 1974 action against the DOC that he was the target of two secret federal and state law enforcement efforts, directed by the FBI and code-named "STOP" and "GILROB," aimed at gathering information about his as-yet unapprehended accomplices in the Brighton bank robbery. See supra p. 3. In securing the 1984 consent decree, therefore, Gilday obtained permanent injunctive relief from any DOC participation in current or future wire- communication interceptions unlawfully directed against him by these state and federal law enforcement agencies consideration unavailable to the  Langton litigants. Accordingly, notwithstanding that the  Gilday consent decree permitted the DOC to litigate future unresolved issues relating to the meaning of the applicable wiretap statutes, Gilday obtained substantial consideration for entering into the settlement with the DOC. Thus, the Langton panel majority's concerns over a lack of meaningful consideration for the Langton plaintiffs' consent are not implicated to the same degree in the present context.  Finally, the Langton and Gilday cases presented themselves in materially different ways on appeal. The Langton panel was asked to review, inter alia, a district court ruling denying a DOC petition to modify the Langton injunction. See id. 14 at 931. On appeal, the DOC claimed that the district court had broadened the injunction impermissibly in favor of the Langton inmates. Id. at 933. The Langton panel majority first decided that the parties had relinquished their respective rights to litigate the meaning of the wiretap statutes underlying the injunction, and then determined that no authoritative decision, existing at the time the Langton injunction issued, specifically supported the challenged MITS monitoring and recording practices. Finally, the Langton majority went on to survey subsequent decisional law, simply noting without resolving the merits that "reasonable [competing] arguments can be advanced" as to whether the challenged MITS monitoring and recording regime violated the federal wiretap statute. Id. at 935-37; see  also  id. at 940 ("Nor does the panel majority hold that the present regime is unlawful under the federal and state statutes but only that reasonable arguments can be made on both sides.") (Boudin, J., dissenting) (emphasis in original). Thus, the Langton majority simply decided that the DOC had failed to carry its burden of demonstrating any change in the law, or the facts, which would warrant modification of the injunction. See id. at 937-38 (sustaining modification ruling as "appropriately tailored to the only changes in law or in fact disclosed on the record before the district court").  In the present case, on the other hand, Gilday alleges DOC violations of an injunction which expressly contemplates that authoritative decisions subsequent to the Gilday injunction may 15 determine whether a violation has occurred. See supra pp. 12-13. Moreover, since the  Langton panel majority never reached the merits regarding the lawfulness of the MITS regime under either wiretap statute, see supra p. 15, we may consider afresh whether the challenged MITS practices violate the  Gilday injunction. Finally, we are required to review the district court's summary judgment ruling against Gilday  de  novo. See  Velez-Gomez, 8 F.3d at 874-75.  For the foregoing reasons, we conclude that the DOC is entitled to litigate the meaning of the applicable wiretap statutes.  3. The Gilday Injunction Gilday argues that the DOC defendants violated the  Gilday injunction by endeavoring to monitor and record his wire communica- tions in violation of the state and federal wiretap statutes. The linchpin in this argument is that no authoritative decision "specifically" construes either the federal or state wiretap statute to "permit" the inmate-telephone system established under the MITS. In other words, Gilday argues that the injunction is violated absent an authoritative decision validating either the MITS regime itself or substantially similar practices in a comparable prison context. At its most particular level, this contention would necessitate an authoritative decision declaring the challenged MITS practices compatible with the applicable wiretap statutes. We test this contention against the language employed in the Gilday injunction, viewed in its unique litigation context, 16 including the particular circumstances surrounding its formation and the basic purposes it was designed to serve. See ITT Continental  Baking  Co., 420 U.S. at 238 (construing ambiguous language in consent decree in light of "the circumstances surround- ing [its] . . . formation"); see also Massachusetts  Ass'n  for Retarded  Citizens,  Inc. v. King, 668 F.2d 602, 607-08 (1st Cir. 1981) (construing consent decree in light of its language, the circumstances surrounding its formation, and its basic purposes); Cornelius v.  Hogan, 663 F.2d 330, 333 (1st Cir. 1981) (noting that court construing ambiguous consent decree may "inquire into the parties' intent and the circumstances surrounding the decree in order to select the most reasonable interpretation").  As a preliminary matter it is necessary to note, however, that no violation of the injunction can be found unless Gilday first established an "interception," as defined under either the federal or Massachusetts wiretap statute, based on "clear and convincing evidence,"  Kemp, 947 F.2d at 16 (citation and quotation marks omitted). See infra pp. 25-27, 29-30. Therefore, Gilday's insistent contention on appeal  that  no MITS practice can ever be allowed under the Gilday injunction unless it has been "specifically permitted" beforehand by an authoritative decision   cannot succeed. Moreover, even assuming Gilday were to demonstrate an "interception," the injunction expressly excepts from its reach any practice "specifically permitted" under the wiretap statutes as construed in authoritative decisions, see supra pp. 3-4, and the 17 term "specifically permitted" is susceptible to various reasonable interpretations. On the one hand, "specifically permitted" may be read to require an authoritative decision that the MITS regime,  as applied directly to Gilday, comports with the applicable wiretap statutes. See Webster's  Third  New  International  Dictionary 2187 (1986) (noting that term "specific" may connote restriction "to a particular individual"); see also Barnett  Bank  of  Marion  County, N.A. v. Nelson,  U.S.  ,  , 116 S. Ct. 1103, 1111 (1996) (noting that "'[s]pecifically'  can mean 'explicitly, particularly, [or] definitively'") (quoting  Black's Law Dictionary 1398 (6th ed. 1990) (emphasis added)). Under such a reading, an authoritative decision would be unavailing to the DOC defendants unless it explicitly addressed the MITS monitoring and recording of wire communications involving Gilday. On the other hand, "specifically permitted" may contemplate simply an authoritative decision upholding interceptions involving some other DOC inmate or DOC inmates in general. See  Webster's Third New International Dictio- nary at 2187 (noting that "specific" may merely restrict to a particular situation). Under these interpretations, therefore, Gilday would need to demonstrate simply an absence of authoritative decisions specifically permitting the challenged MITS practices as applied directly to him or to similarly situated inmates. See  Ambiguity is the "condition of being understood in more than one way." Webster's  Third  New  International  Dictionary 2187 (1966);  see  also William Empson,  Seven Types of Ambiguity 1 (2d ed. 1966) (defining ambiguity as "any verbal nuance, however slight, which gives room for alternative reactions to the same piece of language").  18 Langton, 71 F.3d at 935-37 (noting no reported decision "holding that this type of prison telephone monitoring system" meets "consent" exception to federal wiretap statute). Alternatively, at a more universal level, "specifically permitted" may simply contemplate an authoritative decision upholding the general types or kinds of monitoring and recording practices prescribed by the MITS, without regard to whether the practices were employed in a prison context. See 2  The  Oxford English Dictionary 2949 (Compact Ed. 1987) (defining "specifically" as "[i]n something of the same kind"); see also Webster's  Third New  International  Dictionary at 2187 (defining "specific" as "constituting or falling into the category specified"); Webster's New  World  Dictionary  of  American  English 1287 (3d ed. 1988) (defining "specific" as being "of a special, or particular, sort or kind"); Webster's  Ninth  New  Collegiate  Dictionary 1132 (1989) (defining "specific" as "sharing or being those properties of something that allow it to be referred to a particular category"). Under the latter interpretation, of course, Gilday would need to demonstrate an absence of authoritative decisions vindicating the kinds of practices utilized under the MITS, without necessary regard to the exact context in which the practices were applied, thereby implicating any relevant authoritative decision addressing the applicable wiretap statutes. Thus, under the latter interpretation only  unlawful MITS practices would be barred by the 19 Gilday injunction.  Ambiguities in an injunctive decree are construed in the light most favorable to the alleged contemnor. See  Kemp, 947 F.2d at 16; NBA  Properties, 895 F.2d at 32; see also United  States v. O'Quinn, 913 F.2d 221, 222 (5th Cir. 1990); In re Baldwin-United Corp., 770 F.2d 328, 339 (2d Cir. 1985); New  York  Tel.  Co. v. Communication Workers of America, 445 F.2d 39, 48 (2d Cir. 1971); Ford, 450 F.2d at 280; 11 C. Wright and A. Miller, Federal Practice  &  Procedure:  Civil S 2955, at 310 (1995 & Supp. 1996) (same). For present purposes, therefore, the Gilday injunction would be construed as banning only unlawful interceptions.  The litigation context underlying the Gilday consent decree likewise commends the latter construction. See ITT Continental  Baking  Co., 420 U.S. at 238 (construing ambiguous consent-decree language in light of "circumstances surrounding [its] formation . . .");  see  also  King, 668 F.2d at 607 (similar). Throughout the district court action terminated by the consent decree, the DOC defendants steadfastly denied "monitoring,"  The latter construction is strongly suggested by other language in the Gilday consent decree itself, which explicitly links its injunctive ban to the relevant federal and state wiretap statutes, thereby indicating that the ban was not meant to prohibit conduct lawful under the wiretap statutes themselves either because the practice in question did not constitute an "interception" or it constituted a lawful "interception" as construed in authoritative decisions, extant or forthcoming. See Armour & Co. ,  402 U.S. at 678-80 (construing particular provisions in light of other language in decree); Brewster v. Dukakis, 687 F.2d 495, 499 (1st Cir. 1982) (construing consent decree provision in relation to other language in decree);   United  States  v.  City of Miami, 2 F.3d 1497, 1507-08 (11th Cir. 1993) (construing "consent decree as a whole").  20 "recording," or "intercepting" any wire communication involving Gilday. Thus, implicit in the stance taken by Gilday now is the suggestion that the DOC defendants impliedly conceded prior violations of the relevant wiretap statutes simply by entering into the stipulation of dismissal, whereas the record flatly contradicts any such concession. Instead, the stipulation of dismissal substantiates the view that the DOC defendants simply agreed to an injunction which required their compliance with the applicable federal and state law governing "interceptions." Viewed in context, therefore, the Gilday consent decree entailing no resolution of the central dispute as to whether the DOC defendants ever "monitored" or "recorded," let alone "inter- cepted," any Gilday wire communication is most harmoniously construed as an agreement that the DOC defendants were to refrain from any "interception" violative of either wiretap statute, as  The stipulation of dismissal stated:  By entering into this stipulation, these [signatory] defendants do not admit, but rath- er, generally deny that they have ever violat- ed the plaintiff's rights under . . . the federal wiretapping statute, 18 U.S.C. S 2150 et seq., [and] the state wiretapping statute, M.G.L. c. 272, SS 99 et seq. . . . as alleged by the plaintiff. The  defendants  specifically deny that any of them, or anyone acting in concert with any of them, ever intercepted or monitored  any  of  the  plaintiff's  wire  communi- cations  by  any  means,  lawful  or  unlawful . . . . See Settlement Stipulation: Claims Against Defendants Fair, Vose, Hall and Callahan, Gilday v. Fair, et al., Civ. A. No. 74-4169-C (emphasis added). 21 determined under  either  existing  or  future authoritative decisions. That is to say, the Gilday consent decree bans only unlawful DOC monitoring and recording practices. See Settlement Stipulation: Claims Against Defendants Fair, Vose, Hall and Callahan,  Gilday v. Fair, et al., Civ. A. No. 74-4169-C, discussed supra pp. 20-21 & n.12; see also supra pp. 3-4. The suggested construction comports with the Langton panel majority opinion as well, which held that the  Langton injunc- tion banned any "interception" absent "a specific court order or legislative authorization to do so, except as specifically permitted by these statutes, . . . as they have been construed in reported decisions that are binding in this Court or in the state courts of Massachusetts." Langton, 71 F.3d at 931 (emphasis added). Thus, the Langton panel majority reasoned that the consent decree was to be construed as requiring the DOC defendants to refrain,  in  perpetuity,  from  contesting  the  meaning  of  the  relevant state and federal wiretap statutes "as construed in reported decisions that [were] binding in [the federal district court] or in the state courts of Massachusetts" at the time the Langton injunction was entered, see id. at 931, 933-35, as distinguished from merely requiring the DOC defendants to refrain from unlawful interceptions. As the Langton panel majority viewed the matter, any other approach threatened to render the terms of the Langton injunction "illusory stating nothing beyond what was already forbidden by law  before  the  Permanent  Injunction  was  entered." Id. at 933 (emphasis added); but see id. at 940 (Boudin, J., dissent- 22 ing); see also supra pp. 13-14. The panel majority relied as well on the final section in the  Langton injunction, which stated in terms similar to the  Gilday injunction, see supra p. 4, that the injunction "shall not of its own force affect the rights of inmates of the Department other than William Langton and David LeBlanc." See Langton, 71 F.3d at 933. It reasoned that had the DOC promised merely to obey the law, no purpose would have been served by the quoted provision. See id. Once again, however, the two cases presented themselves on appeal in materially different postures. First, as discussed supra pp. 14-16, the repeated observation by the Langton panel majority, see Langton, 71 F.3d at 933-37 that no then-existing authoritative decision specifically permitted the challenged MITS practices and that the  Langton decree would be rendered meaningless were it to be construed as a mere promise to obey the law is inapposite to the instant context. That is, central to the present analysis is the explicit language in the  Gilday injunction ("or  may be construed in reported decisions"), see supra p. 4 (emphasis added) nowhere to be found in the Langton injunction, see 71 F.3d at 931 which in no sense purports to prohibit either (i) these parties from litigating open questions as to the meaning of the applicable wiretap statutes, or (ii) our consideration of later authoritative decisions upholding monitoring and recording practices of the kind prescribed by the MITS,  see  infra pp. 45-48. Second, since the settlement stipulation and the consent decree in Gilday were entered into while the parties in Langton were still 23 litigating the initial action which led to the  Langton injunction, paragraph 3 in the Gilday injunction ( viz., "[t]his Permanent Injunction . . . shall not . . . affect the rights of inmates other than William Gilday[,]") served the discrete purpose of not disturbing the rights of the Langton inmates whose initial action against the DOC was to remain in litigation for two months after the consent decree was entered in Gilday. Accordingly, unlike the corresponding provision in the Langton injunction, paragraph 3 in the Gilday injunction is entirely consistent with the view that the  Gilday injunction simply contemplates that the DOC not violate the applicable wiretap statutes. For these reasons we conclude, notwithstanding their similarities, that the Gilday injunction is substantially less restrictive in scope than the Langton injunction, in that it unambiguously enjoins only unlawful recording and monitoring practices by the DOC.  The  Gilday injunction was entered on September 12, 1984; the Langton injunction, on November 16, 1984. It is noteworthy as well that the complaint in the action which gave rise to the Gilday injunction alleged that Gilday "has never consented, nor upon information and belief has any person with whom he communicated consented, that wire communications to or from him be intercepted or monitored in any way." Second Amended Complaint, Gilday v. Webster,  et  al., No. 74-4169-C. The Gilday complaint in the present action indicates that his concern in the former action was not with all interceptions of his telephone calls, however, but only with interceptions unlawful under the applicable wiretap statutes because allegedly conducted without the requisite consent. Thus, the more narrow concern reflected in the present complaint comports with the view that the Gilday settlement stipulation and consent decree were meant to ban only unlawful interceptions.  24 A. The Massachusetts Wiretap Act We must now consider whether Gilday demonstrated by "clear and convincing evidence," Kemp, 947 F.2d at 16, that the challenged MITS practices constitute unlawful interceptions under the applicable wiretap statutes, beginning with the Massachusetts Wiretap Act, bearing in mind that it was for Gilday to show that the DOC defendants "violated a clear and unambiguous order that left no reasonable doubt as to what behavior was to be expected" and that the defendants were "'able to ascertain from the four corners of the order precisely what acts are forbidden.'" Id. at 17 (quoting Drywall  Tapers, 889 F.2d at 395). First, we inquire whether the monitoring, recording, and call "detailing" practices prescribed by the MITS Regulations are "interceptions" under the Massachusetts Wiretap Act, Mass. Gen. L. ch. 272, S 99(B)(4). Second, should Gilday successfully surmount the first hurdle, we determine whether any such interpretation is nevertheless permitted under any authoritative decision binding on the federal district court. Finally, we conclude that Gilday failed to prove either that the monitoring and recording practices conducted pursuant to the MITS constitute "interceptions" under the Massachusetts Wiretap Act, or that the MITS call "detailing" practices were clearly prohibited under the Gilday injunction. 1. Monitoring and Recording We begin by noting that the Gilday injunction prohibits only "interceptions" under the applicable statutes and not call monitoring, recording, or "detailing"  per  se. The term "intercep- 25 tion," as used in the Massachusetts Wiretap Act, "means to  secretly hear,  secretly record, or aid another to  secretly hear or  secretly record, the contents of any wire or oral communication through the use of any intercepting device . . . ." Mass. Gen. L. ch. 272, S 99(B)(4) (emphasis added). The Massachusetts courts have interpreted this "secrecy" requirement literally. See Commonwealth v. Jackson, 349 N.E.2d 337, 339-40 (Mass. 1976) (holding that secrecy is essential to establishing a violation of Massachusetts Wiretap Act); see also District Attorney v. New England Tel. & Tel. Co., 399 N.E.2d 866, 869 (Mass. 1980) (stating that  secret recordation of incoming calls violates Massachusetts Wiretap Act). A secretive interception occurs under the Massachusetts Wiretap Act unless both parties to a wire "communication" had "actual knowledge" of the "interception,"  see,  e.g.,  Jackson, 349 N.E.2d at 340, which may be established by evidence that the parties were informed that their conversation was being intercepted, or by "clear and unequivocal objective manifestations of knowledge . . . sufficiently probative of a person's state of mind as to allow an inference of knowledge." Id. As the district court correctly concluded, the recording and monitoring practices at issue here were in no sense surreptitious. Inmates are informed in advance, both by the MITS Regulations  a matter of public record  and the individualized PIN Request Form advisory as well, that their MITS calls will be monitored and recorded. Moreover, inmates are reminded by stickers 26 affixed to each phone that all non-attorney calls are subject to the monitoring and recording practices prescribed by the MITS Regulations. Finally, a prerecorded message informs both parties before the parties can communicate that all call "contents" will be recorded. Against this backdrop, the Massachusetts Supreme Judicial Court ("SJC") has decided that even inmates who "have not consented to the [MITS] monitoring and recording" such as Gilday  nonetheless have been "made aware of the procedure and its require- ments." Cacicio v. Secretary of Public Safety, 665 N.E.2d 85, 91 (Mass. 1996) (rejecting constitutional challenge to MITS Regulations). Therefore, the SJC held, "[t]he [MITS] monitoring and recording is not surreptitious in any sense." Id. Accordingly, we now hold that whatever recording and monitoring of oral communications takes place under the MITS regime does not constitute an "interception" under the Massachusetts Wiretap Act, as it is not secretly conducted. See Jackson, 349 N.E.2d at 339 (non-secret recordings not "interceptions" under Massachusetts Wiretap Act).  2. Call "Detailing" The Massachusetts Wiretap Act defines the term "interception" as a secret acquisition of "the contents of any wire  The SJC did not differentiate between recording of contents and recording of billing-related features ( i.e., "detailing"). Instead,  Cacicio simply described the prerecorded message as notice to the inmate and the person called that the call would be recorded in its entirety. See Cacicio, 665 N.E.2d at 88. 27 or oral communication  through  the  use  of  any  intercepting  device . . . ." Mass. Gen. L. ch. 272, S 99(B)(4) (emphasis added). Elsewhere the statute explicitly excepts certain telephone equipment from its definition of "intercepting device": The term "intercepting device" means any device or apparatus which is capable of . . . recording a wire or oral communication . . . other than any telephone or telegraph instrument, equipment, facility, or a component thereof . . . being used by a communications common carrier in the ordinary course of its business.  Mass. Gen. L. ch. 272, S 99(B)(3)(b). Thus, no "interception" occurs under the Massachusetts Wiretap Act if the device used to acquire the contents of a wire communication comes within the ambit of the "telephone equipment" exception.  The MITS employs a sophisticated network of computers and associated telephone equipment, including "controller boards"  electronic call processing devices attached to each prison telephone  supplied, installed, and maintained by NET. The NET equipment automatically screens approved outside telephone numbers from unapproved numbers, routes inmate calls to approved telephone numbers outside the prison, plays the prerecorded message to both parties, and identifies calls placed to listed attorneys so as to  The SJC has held that a device which records information relating to the identity of the parties to a call or the existence of a wire communication, records the "contents of [a] wire . . . communication." District  Attorney  for  Plymouth  Dist. v. New England  Tel.  &  Tel.  Co., 399 N.E.2d 866 (Mass. 1980), discussed infra pp. 33-35. NET procures the telephone equipment from AT&T and Telematic Corporation under various subcontracts. 28 preclude their monitoring and recordation. All call "detail" is recorded automatically by the NET telephone equipment in order to generate billing reports and safeguard the NET equipment against fraudulent use by inmates ( i.e., inter alia, unapproved long distance and collect calls). The monthly revenue statements NET provides under its contract with the DOC reflect "detail" on all inmate calls placed, including the number dialed, the length of the call, and other billing-related and revenue-related information. In addition, the NET site administrator at each prison facility regularly generates a so-called "Fraud Report," listing all outside telephone numbers to which the total number of calls placed by inmates within the reporting period exceeded a specified level. The Fraud Report is forwarded to NET and the DOC for use in investigating fraudulent telephone usage.  The MITS is similar to the telephone systems utilized by the Bureau of Prisons, as well as in certain state prisons such as New York and Tennessee. See Bender Aff. q 6. However, the MITS utilizes devices far more sophisticated than the "in-house" devices generally considered by this court or the Massachusetts courts. See,  e.g.,  Williams v.  Poulos, 11 F.3d 271, 275-76 (1st Cir. 1993) (involving "custom made" system consisting of "small alligator clips" and a VCR attached to a microphone cable); Griggs-Ryan v. Smith, 904 F.2d 112, 114 (1st Cir. 1990) (involving recording device attached by landlady to extension telephone); Jackson, 349 N.E.2d at 338 (involving cassette recorder microphone attached to earpiece in telephone receiver). Among the abuses the MITS is designed to stop are so-called "third-party" calls placed by inmates to large outside establishments through which the inmate can request another  outside line, then place a long-distance call at the expense of the establishment whose number the inmate called in the first instance. See, e.g., supra note 4. 29 Within the above-described evidentiary framework, we now inquire whether the MITS call "detailing" conducted by NET is excepted from the Massachusetts Wiretap Act definition of "intercepting device" in S 99(B)(3)(b). See supra pp. 28-29. First, we note that NET is a "communication common carrier" within the contemplation of S 99(B)(3). See District  Attorney  For Plymouth  Dist. v. Coffey, 434 N.E.2d 1276, 1280 (Mass. 1982). Second, Gilday does not contend that the processor computers and controller boards used by NET for billing-related purposes are not "equipment . . . being used in the ordinary course of [NET's] business." See Reply Brief for the Plaintiff, Appellant at 6 n.8 ("Gilday does not argue that NET is precluded from using call detail for billing purposes."). Nor does any authoritative decision suggest that a communication common carrier which "details" calls in order to generate billing reports or protect its equipment from fraudulent abuse, does not do so in the ordinary course of its business. Thus, Gilday has not demonstrated by "clear and convincing" evidence,  see  Kemp, 947 F.2d at 16, that any  We have construed the Federal Wiretap Act, which the Massachusetts statute tracked, see Commonwealth v. Vitello, 327 N.E.2d 819, 836 (1975), as conferring a "statutory right" upon a communication common carrier to intercept wire communications in order to protect its rights and property interests. United States v.  Pervaz, --- F.3d ---, ---, 1997 WL 336208, *5 (1st Cir.) (R.I.) (construing 18 U.S.C. S 2511(2)(a)(i), which permits an employee of a wire communication services provider whose facilities are used in transmission of wire or electronic communication, "to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service"). 30 call "detailing" conducted by NET for its own billing-related purposes falls outside the S 99(B)(3)(b) exception for equipment used by it "in the ordinary course of its business." Accordingly, no "interception" occurs under the Massachusetts Wiretap Act, at least by reason of the billing-related "detailing" conducted by NET.  Gilday nonetheless insists, however, that the injunction precludes the DOC defendants from acquiring access to any call "detail" information and that NET therefore may not aid and abet the DOC by affording access. See Reply Brief for Plaintiff, Appellant at 6 n.8. Under the Regulations and the MITS "Procedural Statement"  a DOC operations guideline which supplements the MITS Regulations  authorized DOC officers may request both "standard" and "custom" call "detail" reports from NET personnel for investigative  purposes, or, after receiving training from NET personnel, print out such call "detail" reports themselves. Moreover, these "standard" reports may, at the DOC's option, be configured to provide call "detail" relating to an individual inmate's PIN, a particular group of inmate PINs, specific prison telephones used to place calls, or particular telephone numbers dialed. Finally, since the record discloses no limitation on the domain reserved for the so-called "custom" reports, we assume, at  Although the record is unclear as to what, if any, role AT&T as NET's subcontractor performs in call "detailing," our analysis of the NET role in call "detailing," supra pp. 27-30, appears equally applicable to AT&T, which is a communication common carrier as well. See Mass. Gen. L. ch. 272, S 99(B)(3)(b). 31 the summary judgment stage,  see  Velez-Gomez, 8 F.3d at 874-75, that NET is obligated to provide the DOC with any and all call "detail" requested. Notwithstanding its advantageous summary judgment posture, however, the Gilday call "detailing" claim fails in relation to the DOC defendants as well.  Gilday claims that the DOC violates the injunctive ban against "intercepting" or "endeavoring to intercept" his wire communications, see supra pp. 3-4, simply by applying the MITS requirements to him; in particular, by making his consent a prerequisite to utilizing the MITS. The claim is premised on several rationales: first, the MITS requirements cannot be applied to  him, since the  Gilday injunction bans all "interceptions" of his calls, absent a relevant court order, legislative authorization, or authoritative decision specifically permitting the challenged MITS practices in their prison context; second, since he has never consented to the MITS regime, DOC call "detailing" cannot meet the "two party consent exception" under Mass. Gen. L. ch. 272, S 99(B)(4), even assuming consent by the party called; and third, even assuming he were found to have given implicit consent by utilizing the MITS, the injunctive ban on "interceptions" is infringed by DOC call "detailing," because it secretly records the outside number dialed by the inmate before the other party can  Section 99(B)(4) provides, in pertinent part, that the "term interception means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication . . . by any person other than a person given prior authority by all parties to such communication." Mass. Gen. L. ch. 272, S 99(B)(4). 32 consent; for example, should the outside phone not be answered. All these contentions likewise fail. As with monitoring and recording, see supra pp. 25-27, virtually all call "detailing" conducted under the MITS regime is thoroughly advertised. In addition to the MITS Regulations, the "Number Request Form" itself discloses that all inmate calls are subject to call "detailing." Moreover, the recorded message heard both by the inmate and the call recipient advises that their entire conversation and all "call detail" will be recorded. Thus, whatever "detailing" occurs  after the call recipient is so advised by the recorded message comports with the Massachusetts Wiretap Act, as both parties have been fully informed in advance that their entire oral communication, as well as all "call detail," will be recorded. See Jackson, 349 N.E.2d at 339 (non-secret recordings not "interceptions" under Massachusetts Wiretap Act).  At summary judgment, however, Gilday proffered unrebutted evidence that the outside number dialed by the inmate is recorded before the call is answered; in other words, before the prerecorded message announcing the MITS monitoring/recording regime has been heard by the party who answers the call. Thus, the number called by the inmate will have been subjected to call "detailing," whether or not the party called answers the phone or withholds "consent" to the MITS recording and call "detailing" procedure subsequently announced in the prerecorded message. Gilday therefore contends  On appeal, AT&T vigorously disputes that any such "secret" call detailing occurs in these circumstances. Nevertheless, none 33 that defendants violate the injunction by "endeavoring" to record call "detail" during the  interim between the dialing of the outside number by the inmate and before the call can be answered and accepted what we shall refer to as "interim call detailing." Gilday relies heavily on a line of SJC decisions, see, e.g., District  Attorney  for  Plymouth  Dist. v. New  England  Tel.  & Tel.  Co., 399 N.E.2d 866 (Mass. 1980), treating with "pen registers" and "call traps," telephone equipment consisting of electronic devices which surreptitiously record, respectively, the number called or the number from which an incoming call was placed. These authoritative decisions hold that such electronic devices do record call "contents," within the meaning of the Massachusetts Wiretap Act, since they acquire "'information concerning the identity of the parties to such communication or the existence . . . of that communication.'" Id. at 869 (quoting Mass. Gen. L. ch. 272, S 99(B)(5)). Thus, "[e]ven if the call is not completed, the caller has initiated a wire communication . . . which is intended to cause . . . [the call recipient's] telephone to ring and the existence of that communication is recorded by an intercepting  of the defendants challenged Gilday's proffer in their opposition to summary judgment, as required by Mass. D. Ct. Local Rule 56:  Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties. Consequently, we credit Gilday's assertion for summary judgment purposes. See Carreiro v. Rhodes Gill & Co., Ltd., 68 F.3d 1443, 1446 & n.3 (1st Cir. 1995). 34 device." Id. Be this as it may, however, it gains Gilday nothing. First of all, it is important to note that the SJC's definition of "wire communication,"  see  id., would not encompass an attempt by an inmate to call a number not on the preapproved MITS list, since the MITS regime automatically prevents such calls from getting past its "host processors," the computers which control the outflow of inmate calls from the prison. Consequently, inmate attempts to dial numbers not approved under the MITS regime cannot cause an outside telephone to ring, because the call cannot be connected to the point of reception. Accordingly, there can have been no "wire communication," which is defined as "any communication . . . by the aid of wire, cable or other like connection  between  the  point  of  origin  and  the  point  of  reception." Mass. Gen. L. ch. 272, S 99(B)(1). (Emphasis added.) Second, should an inmate initiate a call through the MITS regime, he will already have completed the "Number Request Form," thereby  divulging in advance to the DOC the very entity which previously advertised its intention to monitor and record all outgoing inmate calls to nonattorneys  both  the  telephone  number  and  the  name  and relationship of the family member or friend to whom the call is directed. See supra p. 6. Third, no reported Massachusetts decision has ever involved sufficiently similar circumstances so as to constitute an authoritative decision that call "detailing" in the present context is unlawful.  Cf.,  e.g.,  Jackson, 349 N.E.2d at 338-40 (discussing residential telephone subscriber's interceptions of incoming calls to ascertain calling number and identity of 35 unknown caller); District Attorney For Plymouth Dist., 399 N.E.2d at 867, 869-70 (discussing judicial power to compel telephone company, pursuant to warrant, to assist installation of cross- frame-unit trap on particular telephone line in order to record telephone numbers from which incoming calls were made in circumstances where callers' numbers and identities had  not already been divulged by callers in advance); New England Tel. & Tel. Co. v.  District Attorney For Norfolk Dist. , 373 N.E.2d 960, 962 (Mass. 1978) (discussing judicial power to order telephone company to assist installation of pen register to determine telephone numbers dialed from particular phone);  District Attorney For Plymouth Dist. v. Coffey, 434 N.E.2d 1276, 1278 (Mass. 1982) (discussing warrantless interception by telephone company of calls to residential line to ascertain previously unknown telephone numbers from which incoming, harassing telephone calls were being made).  Furthermore, Gilday has never alleged an intention to call a telephone number or party not listed by him on the required MITS "Number Request Form," see supra p. 6, even assuming he were to elect to utilize the MITS. Instead, since there can be no secretive acquisition of information already provided to the DOC, see  supra pp. 25-27 (noting that "secretive" interceptions presume lack of knowledge), Gilday simply assumes, sub silentio, that any putative number(s) and person(s) he might call would not already  In another case, the SJC declined to address a claim that the MITS violates the Massachusetts Wiretap Act, as it had not been raised below. See Cacicio, 665 N.E.2d at 89 n.9.  36 have been known to the DOC before the call was placed. Absent evidence on this critical point, however, there can have been no prima facie showing that any surreptitious or secretive "interception" would occur, let alone did occur, within the meaning of the Massachusetts Wiretap Act. See Jackson, 349 N.E.2d at 340 (holding that a secretive "interception" has occurred unless both parties to the call had "actual knowledge" of the intrusion). In all events, as noted above, see supra pp. 34-35, were Gilday to continue to withhold consent but attempt to place a call or consent, yet attempt to call a number not previously approved by the DOC  the MITS computers would screen out the attempted call. Thus, under Massachusetts law, no "wire communication" could occur. See Mass. Gen. L. ch. 272, S 99(B)(1) (defining "wire communication" as any "connection between the point of origin and the point of reception") (emphasis added); see also District Attorney  for  Plymouth  Dist. v. New  England  Tel.  &  Tel.  Co., 399 N.E.2d 866, 869 (Mass. 1980).  Although Gilday argues on appeal that interim call "detailing" would violate the Massachusetts Wiretap Act because it would record inmate attempts to call telephone numbers not listed on their respective Number Request Forms i.e., that MITS call "detailing" takes place even though the inmate calls a party not on the Number Request Form, hence not already known to the DOC he has never alleged an intention to make such calls i.e., to circumvent the requirements of the MITS  even assuming he were to participate in it. Thus, the present attempt to hypothesize an abstract interim call "detailing" violation raises no justiciable case or controversy, as the injunction simply prohibits the DOC from intercepting or endeavoring to intercept any wire communication by Gilday. See Pacific  Gas  &  Elec.  Co. v. State Energy  Resources  Conservation  and  Dev.  Comm'n, 461 U.S. 190, 203 (1983) (declining on Article III ripeness grounds to consider constitutionality of California law allowing State to block 37 In conclusion, any attempt to dial a number not previously disclosed by an inmate on the Number Request Form: (i) results in no "wire communication" to the person called, as it cannot proceed beyond the prison, see supra p. 34-35; and (ii) voluntarily discloses to the DOC the number called, without any "wire communication" having taken place. Thus, interim call "detailing" under the MITS regime is neither "secretive" within the meaning of the Massachusetts Wiretap Act, nor an "interception" within the scope of the Gilday injunction. Accordingly, the district court supportably determined that the challenged MITS practices did not violate the Massachusetts-law component in the Gilday injunction. Moreover, there is no basis for the conclusory contention that the Gilday injunction is violated simply by the MITS regulatory requirement that he, like any other inmate, consent to the MITS regime, including call "detailing," as a prerequisite to utilizing the MITS hence, that the consent requirement constitutes a coercive endeavor to intercept Gilday's wire communications in violation of the injunction. See supra pp. 31- 32. First, its unstated premise that Gilday is entitled to utilize prison phones even though he withholds consent is groundless. As a prison inmate, Gilday can identify no federal or state right   construction of nuclear power plants lacking adequate storage capacity for spent nuclear fuel, because the Court "cannot know" if State "will ever find a nuclear plant's storage capacity to be inadequate"); Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847-48 (1st Cir. 1990) (refusing on Article III ripeness grounds to address claim based on abstract injury "that may not occur as anticipated or may not occur at all"). 38 constitutional or otherwise  to utilize a prison phone on his own terms. See,  e.g.,  Washington v.  Reno, 35 F.3d 1093, 1100 (6th Cir. 1994) (stating that "a prisoner's right to telephone access is 'subject to rational limitations in the face of legitimate security interests of the penal institution'") (quoting Strandberg v. City of Helena, 791 F.2d 741, 747 (9th Cir. 1986))); see also Feely v. Sampson, 570 F.2d 364, 374 (1st Cir. 1978) (stating that the right of pretrial detainees to make telephone calls, while "not free from doubt[,]" is subject to reasonable restrictions); Cacicio, 665 N.E.2d at 92 (upholding MITS limitations on inmate telephone access as constitutional, and citing Bellamy v. McMickens, 692 F.Supp. 205, 214 (S.D.N.Y. 1988), for the proposition that prisoners have no right to unrestricted telephone use). Second, the Gilday injunction does not purport to ban call "detailing" lawfully conducted under federal and state law. See  supra pps. 3-4, 20-25. And since MITS call "detailing" cannot occur absent inmate consent a prerequisite to access to the MITS, see supra pp. 6-7 the very least that can be said is that there is no clearly-defined, see Kemp, 947 F.2d at 17, "interception" under either federal or state law, see supra pp. 34-37; infra pp. 45-48. Third, the verb "endeavor," meaning "to work with set purpose," or "make an effort" to accomplish a particular purpose, see Webster's  Third  New International Dictionary 748 (1986)  here, allegedly, to conduct unlawful interceptions of Gilday's wire communications cannot bear the weight he places on it. Given the uncontroverted evidence that extensive inmate fraud and criminal activity necessitated the 39 MITS, see supra p. 4, Gilday cannot demonstrate that the establishment of the MITS universally available exclusively to inmates  who  consent  to  its  terms ( including  Gilday, should he elect to participate) constituted an "endeavor" to "detail" Gilday's telephone calls unlawfully, and thus constituted a clear violation of the Gilday injunction, see Kemp, 947 F.2d at 17. Once again we emphasize the obvious simply because it is so consistently elided by Gilday, both below and on appeal: The Gilday injunction grants Gilday  no  right  or  privilege  to  place  any telephone call, nor has Gilday cited any authoritative decision indicating that conditioning prison-telephone utilization on informed prisoner consent to reasonable prison-security safeguards violates a federal or state right. See Langton, 71 F.3d at 936 (stating: "at the least, grounds exist for genuine dispute" about whether DOC "defendants are authorized by law" to require prisoner consent to MITS regime) (citing  Griggs-Ryan v.  Smith, 904 F.2d 112 (1st Cir. 1990) (holding that "implied consent" is inferred from circumstances indicating that party knowingly agreed to surveillance)); see also Washington, 35 F.3d at 1100 (prison may impose rational limits on inmate telephone access, including subjecting inmates to MITS-type system); Strandberg, 791 F.2d at 747 (prisoner's right to telephone access subject to reasonable restrictions);  Feely, 570 F.2d at 374 (right of pretrial detainees to place telephone calls is subject to reasonable restrictions); Cacicio, 665 N.E.2d at 90 (upholding MITS as reasonable security measure). But  cf.  United States v.  Cheely, 814 F.Supp. 1430, 1443- 40 44 (D. Alaska 1992) (rejecting argument that prison may deem consent implied in situations where inmate must consent to terms in order to place calls, but finding surveillance of prison phones "a necessary price for prison security"), aff'd, 36 F.3d 1439 (9th Cir. 1994). In sum, the  Gilday injunction does not purport to entitle Gilday to utilize the MITS without acceding to lawful restrictions founded upon reasonable prison-security measures. Furthermore, inmates who voluntarily withhold their consent retain their constitutional right to communicate with their attorneys (and with family and friends) through prison visitations and the mail. Thus, it is unfounded supposition to suggest that the DOC has "endeavored" to do anything other than afford inmates the opportunity to utilize the MITS, subject to reasonable restrictions designed to preclude fraud, crime, and misuse of the prison telephone system. Accordingly, the claim that the DOC is "endeavoring" to "detail" Gilday's telephone calls in violation of the Gilday injunction fails.  We note that the Gilday call "detailing" contention is problematic in another important respect, since Mass. Gen. L. ch. 272, S 99(B)(3)(a), excepts from its definition of the term "intercepting device" any device or apparatus "furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business." The SJC has indicated that institutional efforts to ensure security constitute activities in the "ordinary course of business" for S 99(B)(3)(a) purposes. See  Crosland v.  Horgan, 516 N.E.2d 147, 150 (Mass. 1987) (stating that preservation of security may be viewed as within hospital's "ordinary course of business"). Similarly, the SJC has stated that maintenance of security is "an essential incident to the business of a prison." Id. (dicta) (describing 41 Finally, even assuming, arguendo, that Gilday were to overcome all other hurdles, in fine his call "detailing" claim engenders substantial justiciability concerns not addressed by the parties. Article III, section 2, of the United States Constitution confines federal court jurisdiction to actual "cases" and "controversies." U.S. Const. art. III, S 2. Article III was designed to ensure that federal courts decide only disputes of "a Judiciary nature," M. Farrand, 2 Records of the Federal Convention of  1787, at 430 (1911), thereby prohibiting advisory opinions, Flast v. Cohen, 392 U.S. 83, 96 (1968). In order to satisfy the "case or controversy" requirement, the plaintiff must demonstrate "'a personal stake in the outcome[,]'" City  of  Los  Angeles v. Lyons, 461 U.S. 95, 101 (1983) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)), and the complaint must present a controversy neither "conjectural [n]or hypothetical," but both "real and immediate," see id. at 102, without regard to the type of relief  purport of  Campiti v.  Walonis, 453 F.Supp. 819, 822 (D.Mass. 1978), aff'd, 611 F.2d 387 (1st Cir. 1979)). Perhaps most significantly, in response to a constitutional challenge the SJC has held that the MITS serves "the legitimate purpose of improving the security of the Massachusetts correctional system" by acting as a "deterrent against improper use" of prison telephones.  Cacicio, 665 N.E.2d at 90. Thus, it can be concluded, with considerable confidence in our judgment, that the issue as to whether corrections officials may intercept MITS calls in the "ordinary course of [prison] business," under the protection of S 99(B)(3)(a), is at the very least reasonably debatable, and, therefore, that Gilday's contention comes a cropper. See  Kemp, 947 F.2d at 17 (stating that injunction must leave "no reasonable doubt" what conduct is prohibited); see also Langton, 71 F.3d at 936 (finding "reasonably debatable" the issue as to whether MITS monitoring comes within the "ordinary course of business of a law enforcement officer" as defined by Federal Wiretap Act). 42 sought,  see  Skelly Oil v.  Phillips Petroleum Co. , 339 U.S. 667, 671 (1950).  Among the showings required under the "case or controversy" requirement is "ripeness," which governs  when a proper party may bring a justiciable action consistent with Article III. See Thomas v. Union  Carbide  Agric.  Prods.  Co., 473 U.S. 568, 580 (1985) ("'[R]ipeness is peculiarly a question of timing.'") (quoting  Regional Rail Reorganization Act Cases , 419 U.S. 102, 140 (1974)). The basic rationale underlying the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott  Laboratories v. Gardner, 387 U.S. 136, 148-49 (1967); Pacific  Gas  &  Elec.  Co. v. State  Energy Resources  Conservation  and  Dev.  Comm'n, 461 U.S. 190, 200 (1983) (same). The ripeness determination thus turns on "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" Id. at 201 (quoting Abbott Lab., 387 U.S. at 149);  Lincoln House, Inc. v.  Dupre, 903 F.2d 845, 847 (1st Cir. 1990) (same). As we have explained, "[p]erhaps the most important consideration in determining whether a claim is ripe for adjudication is the extent to which 'the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all.'" Id. (quoting 13A Wright and 43 Miller, Federal  Practice  and  Procedure S 3532.2, at 141 (1984)). See also Metzenbaum v. Federal Energy Regulatory Comm'n, 675 F.2d 1282, 1289-90 (D.C. Cir. 1982); A/S  Ludwig  Mowinckles  Rederi v. Tidewater Construction Corp., 559 F.2d 928, 932 (2d Cir. 1977). As Gilday has never utilized the MITS regime, there can have been no call "detailing" of any Gilday "wire communication." Accordingly, no Gilday wire communication could have been subjected to "interception" by NET, ATT or the DOC; consequently, there can have been no "endeavoring to intercept." Moreover, as Gilday gives no indication that he intends to consent, any DOC "detailing" of a potential wire communication remains entirely hypothetical. Nor can it simply be  presumed that the DOC will "detail" unlawfully any call to which Gilday might be a party in the future, nor even that he would dial a number which might prompt a call "detail" report. See Pacific  Gas  &  Elec.  Co., 461 U.S. at 200. Thus, the call "detailing" claim, in fine, "'involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all.'" Lincoln House, 903 F.2d at 847 (quoting 13A Wright and Miller, Federal Practice and Procedure S 3532.2, at 141 (1984)).  For the foregoing reasons, we conclude that the claims premised on the Massachusetts Wiretap Act are unavailing.  B. Title III Although the Federal Wiretap Act (Title III, Omnibus Crime Control and Safe Streets Act, 18 U.S.C. SS 2510 et seq. ("Title III")) generally forbids "interceptions" of wire communica- tions absent prior judicial authorization, it expressly provides 44 that "[i]t shall not be unlawful . . . for a person acting under color  of  law to intercept a wire, oral, or electronic communication where . . .  one  of  the  parties  to  the  communication  has  given  prior consent  to  such  interception." 18 U.S.C. S 2511(2)(c). (Emphasis added.) The "consent" exemption under Title III is "'construed broadly'" as encompassing implied consent. Griggs-Ryan v. Smith, 904 F.2d 112, 116 (1st Cir. 1990) (quoting United States v. Amen, 831 F.2d 373, 378 (2d Cir. 1987)); see also United  States v. Workman, 80 F.3d 688, 693-94 (2d Cir.) (same),  cert.  denied, 117 S. Ct. 319 (1996); S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 2112, 2182 (same). Under the MITS regime, the following prerecorded message is heard by both parties immediately after the recipient responds to an inmate call and before the parties can communicate: NYNEX [or AT&T for long distance calls] has a collect call from [name of inmate], an inmate at the [name of correctional facility]. To re- fuse this call, hang up. If you use three-way calling or call waiting, you will be disconnected. All call detail and conversation, excluding approved attorney calls, will be recorded. To  accept  this  call,  dial "1" now. (Emphasis added.) Thus, upon dialing "1" the party reached at the number dialed by the inmate consents to the MITS regime prior to any communication with the inmate. Although Gilday points out that  he has never consented   either explicitly or implicitly  to the MITS regime, the federal wiretap statute as well as relevant authoritative decisions 45 indicate that the requisite consent under the Federal Wiretap Act may be provided by either party. See 18 U.S.C. S 2511(2)(c) (no impermissible "interception" where "one of the parties to the communication has given prior consent to such interception"); see also  United States v.  McDowell, 918 F.2d 1004, 1006 (1st Cir. 1990) (finding no Title III bar to telephone interceptions based on unilateral consent); United States v. Pratt, 913 F.2d 982, 986-87 (1st Cir. 1990) (finding unilateral consent adequate to permit interception under federal law). Thus, MITS call "detailing" and recording does not offend Title III. Moreover, it is settled law in the First Circuit and elsewhere that "Title III affords safe harbor not only for persons  Call "detailing," moreover, is not within the ambit of the Federal Wiretap Act, as it simply captures electronic signals relating to the PIN of the caller, the number called, and the date, time and length of the call. See 103 C.M.R. S 482.06(1). The Federal Wiretap Act defines "interception" as an "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical or other device." 18 U.S.C. S 2510(4) (emphasis added). Subsection 2510(8) in turn defines "contents" as "any information concerning the substance, purport, or meaning of [the] . . . communication." Id. S 2510(8). The United States Supreme Court, in an analogous context, has held that "pen registers" devices which can record any number dialed from a particular telephone do not violate the Federal Wiretap Act "because they do not acquire the contents of communica- tions as that term is defined by 18 U.S.C. S 2510(8)." United States v.  New York Tel. Co. , 434 U.S. 159, 167 (1977). Similarly, the SJC has held that pen registers "are not governed by Title III, since there is no 'aural acquisition' of anything." District Attorney For Norfolk District, 373 N.E.2d at 962. The legislative history of the 1986 Amendments to the Federal Wiretap Act likewise indicates that Congress intended to exclude call "detailing" devices. See S.Rep. No. 99-541, 99th Cong., 2nd Sess., reprinted in 1986 U.S.C.C.A.N. 3555 (stating that devices which record electronic data "capture no part" of the contents of "an actual telephone conversation").  46 who intercept calls with the explicit consent of a conversant but also for those who do so after receiving implied consent."  Griggs- Ryan, 904 F.2d at 116; see also Williams v. Poulos, 11 F.3d 271, 281 (1st Cir. 1993) (same). Accord  United States v.  Van Poyck , 77 F.3d 285, 292 (9th Cir.), cert. denied, 117 S. Ct. 276 (1996); United States v.  Horr, 963 F.2d 1124, 1126 (8th Cir. 1992);  United States v.  Willoughby, 860 F.2d 15, 19 (2d Cir. 1988) (citing  Amen, 831 F.2d at 378); Watkins v. L.M.  Berry  &  Co., 704 F.2d 577, 581 (11th Cir. 1983). Implied consent may be "inferred from . . . language or acts which tend to prove . . . that a party knows of, or assents to, encroachments on the routine expectation that conversations are private." Griggs-Ryan, 904 F.2d at 116-17 (internal citations and quotations omitted). Thus, "a reviewing court must inquire into the dimensions of the consent and then ascertain whether the interception exceeded those boundaries."  Id. at 119 (emphasis added). The prerecorded MITS message explicitly advises that "[a]ll call detail and conversation, excluding approved attorney calls,  will  be  recorded,"  see  supra p. 45 (emphasis added), thereby informing the call recipient that the entire "contents" will be intercepted. Consequently, notwithstanding the absence of explicit notice of the lesser intrusion represented by possible monitoring of call content, the recipient is fully informed of the greater  The MITS regime permits random monitoring, as well as particularized investigative monitoring the latter based on suspected criminal activity. 47 intrusion;  viz., that the  entire  conversation, as well as all call "detail," will be intercepted and recorded. See id.; see also Williams, 11 F.3d at 281-82 (discussing elements of implied consent). Thus, since the MITS records the entire conversation, any concurrent aural monitoring by authorized DOC officials in no sense exceeds the dimensions of the broad implied consent given to record all call "content," including call "detail." See Griggs- Ryan, 904 F.2d at 114, 116-19 (finding implied consent to interceptions, consisting of concurrent aural monitoring and recording of telephone conversations, after plaintiff had been informed of the recording only and no restrictions had been placed on the scope of the interceptions); see also Williams, 11 F.3d at 282 (stating that implied consent obtains where party to conversa- tion was provided with at least "minimal knowledge" of scope of interception). Therefore, based on the relevant authoritative decisions, it is at the very least an open question whether the express prior consent provided by MITS-call recipients to the recordation of all call "content" constitutes implied consent to monitoring.  Finally, as this is a civil contempt proceeding it was for Gilday to prove that the DOC defendants "violated a clear and unambiguous order that left no reasonable doubt as to what behavior  Although it has been held outside the prison context  that mere "knowledge of the capability of monitoring alone cannot be considered implied consent,"  Watkins, 704 F.2d at 581 (emphasis in original), under the MITS the recipient of the call is informed that the entire call will be recorded.  48 was to be expected" and that the DOC was "'able to ascertain from the four corners of the order precisely what acts . . . [were] forbidden.'" Kemp, 947 F.2d at 17 (quoting Drywall  Tapers, 889 F.2d at 395). Since the Gilday injunction bans only unlawful practices by the DOC defendants, see supra pp. 20-22 and authoritative decisions supportably indicate at the very least that the challenged MITS practices constitute lawful monitoring, Gilday has not demonstrated a "clear and unambiguous" violation of Title III. Accordingly, the district court correctly concluded that Gilday failed to establish a violation of the Gilday injunction, either by the DOC or by its putative aiders and abettors, NET and AT&T.  C. The Section 1983 Claims In a civil rights action under 42 U.S.C. S 1983, the  Various federal decisions have upheld similar prison monitoring and recording practices under the Federal Wiretap Act. See, e.g., Horr, 963 F.2d at 1126; United  States v. Sababu, 891 F.2d 1308, 1326-30 (7th Cir. 1989);  Willoughby, 860 F.2d at 19-21; Martin v. Tyson, 845 F.2d 1451, 1458 (7th Cir. 1988); Amen, 831 F.2d at 378-80;  United States v.  Paul, 614 F.2d 115, 117 (6th Cir. 1980); United  States  v.  Green, 842 F.Supp. 68, 71-72 (W.D.N.Y. 1994), aff'd, 80 F.3d 688, cert.  denied, 117 S. Ct. 319 (1996); United States v. Valencia, 711 F.Supp. 608, 611 (S.D. Fla. 1989); Lee v. Carlson, 645 F.Supp. 1430, 1438-39 (S.D.N.Y. 1986). Additionally, the Eleventh Circuit has held that a personal call may be intercepted by a business under S 2510(5)(a)(i) "to the extent necessary to guard against unauthorized use of the telephone or to determine whether a call is personal or not." Watkins, 704 F.2d at 583. Similarly, the Eighth Circuit has suggested that in circumstances where an employee is believed to be committing a crime or making excessive personal calls, employer monitoring of employee phone calls may not be an unlawful "interception" under the "ordinary use" exception applicable to extension phones in S 2510(5)(a)(i). See Deal v.  Spears, 980 F.2d 1153, 1158 (8th Cir. 1992).  49 plaintiff must prove by a preponderance of the evidence that a person acting under color of state law deprived him of a right guaranteed by the United States Constitution or the laws of the United States. Martinez v. Colon, 54 F.3d 980, 984 (1st Cir.), cert. denied, 116 S. Ct. 515 (1995); Tatro v. Kervin, 41 F.3d 9, 14 (1st Cir. 1994). Gilday argues that the terms of the Gilday injunction grant him a "federal right to be free of any intercep- tion of his wire communications not specifically permitted under the terms of the Permanent Injunction." From this mistaken premise he maintains that the DOC defendants violated section 1983 by implementing the MITS under color of Massachusetts law in violation of the Gilday injunction, thereby depriving him of a "federal right." Likewise, he claims that AT&T and NET are state actors, liable for aiding and abetting the alleged violations by the DOC defendants. As the Gilday injunction was never violated, however, these civil rights claims collapse as well. III CONCLUSION Appellant having failed to show as a matter of law that appellees violated the permanent injunction or caused a deprivation of any federal or constitutional rights, the judgment of the district court is affirmed.  On appeal, Gilday has abandoned the claim that defendants deprived him of "meaningful access to the courts," as well as his Sixth and Fourteenth Amendment rights. We therefore deem any such section 1983 claim waived. See  Playboy Enterprises, Inc. v.  Public Service Commission of Puerto Rico , 906 F.2d 25, 40 (1st Cir. 1990). 50